1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HANA HILSENRATH
OLIVER HILSENRATH
822 Eastbrook Court
Danville, CA 94506
Telephone: 925 212 6299
Facsimile: 925 736 7571
ohlx@sbcglobal.net

PLAINTIFFS *IN PRO PER*

ORIGINAL
FILED

JULY 29 ...

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

MMC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**C 07 2782**

HANA HILSENRATH, OLIVER
HILSENRATH, NAMA HILSENRATH,
LIOR HILSENRATH, ELLA HOPE
HILSENRATH, ISAIAH BENJAMIN
HILSENRATH, SAUL NATHANIEL
HILSENRATH, THE LIVING TRUST OF
MELANIE AND ANDRE HILSENRATH,

    Plaintiffs,

       v.

THE SWISS CONFEDERATION, THE
FEDERAL ATTORNEY GENERAL OF
SWITZERLAND, GERARD SAUTEBIN,
BRENT HOLTKAMP, AND DOES 1-10,

    Defendants.

Case No.

**COMPLAINT FOR THE DEPRIVATION OF
RIGHT FOR LIBERTY, OF RIGHT TO
PROPERTY, AND OF THE RIGHT TO
CIVIL FREEDOMS GRANTED BY THE
4TH, 5TH AND THE 6TH AMENDMENT OF
THE CONSTITUTION OF THE UNITED
STATES OF AMERICA**

<u>**INTRODUCTION**</u>

1. This current complaint is respectfully submitted *in pro per* by
   plaintiffs Hana and Oliver Hilsenrath, US citizens and
   residents of the state of California, as the result of
   defendants' 3rd year freeze of plaintiffs' assets, turning
   hired legal representation inaccessible.



2. The Swiss Confederation and the other defendants in this complaint froze plaintiffs' assets in 8 foreign countries alleging that those assets were the result of theft.

3. The theft is alleged to have occurred in the United States, specifically in the northern distract of California.

4. The US government investigated the alleged theft, having allegedly occurred on American soil, and determined that the assets were legitimately obtained.

5. The US government and federal court in California stated in dozens of letters and orders to defendants that the freeze of plaintiffs' assets is unjustified.

6. The Swiss Confederation made abundant use of the international treaties with the US to investigate and effect the freeze.

7. The Swiss chose, however, not to comply with the same international treaties when the US government ordered the Swiss that the freeze is wrongful, and plaintiffs' assets should be released.

8. In a series of actions, the Swiss, defendants in this case, continue for the 3rd year, now, to freeze assets, diminish their value, defame the plaintiffs, and violate their constitutional right to property.

9. To further deter plaintiffs from pursuing their just right to property, defendant Swiss confederation issued, with no intelligible purpose, an international arrest warrant to the 181 nations  - members of the Interpol - for the arrest of Oliver Hilsenrath.

10. Defendants, Swiss authorities, acted in self-interest, and in breach of civil liberties.

11. No charges or any other formal complaints were ever filed against the Hilsenraths.

12. Defendants, Swiss authorities, exercised baseless, cruel and unusual collective punishment on the sizable Hilsenrath family. The Swiss were well aware that the frozen assets are jointly owned by the Hilsenraths and that the Hilsenraths care for 6 children, mostly minors.

13. By so acting, the Swiss Confederation, their employees, instrumentalities and cooperators have not only harmed the plaintiffs, but also disturbed the balance on which international law and international legal treaties are regulating the world economy and human rights.

14. Plaintiffs seek to have their assets restored after the 3-year-long damage by defendants.

15. Plaintiffs also seek to be compensated by defendants for all losses, damages and expenses incurred.

## JURISDICTION AND VENUE

16. Plaintiffs 1-7 are citizens of the United States and residents of California, while defendants are a foreign sovereign and mostly residents of foreign states.

17. The Federal court has jurisdiction over this case and the venue in the Northern District of California is adequate pursuant to *28 U.S.C. § 1330§, 1331, § 1332.*

18. Defendants seized and diminished the value of property of US citizens[1].

---

[1] <u>Shaffer v. Heitner, 433 U.S. 186 (1977)</u>: [T]he property alone provides a sufficient contact for a court having jurisdiction over that geographic area to adjudicate claims relating to the ownership of the property, or relating to injuries which occurred there. In that case, the jurisdiction exercised by the court is referred to *in rem* jurisdiction (i.e. jurisdiction over the thing), instead of *in personam* jurisdiction.

## DEFERENCE TO PLAINTIFF'S FORUM

19. The US federal jurisdiction is appropriate in this case. Deference to the plaintiff's forum is a stronger consideration where the plaintiff is an American citizen, especially in this current case in which the underlying claims arose under United States law (wrongful allegations that an improper act occurred on US soil and then extended to Switzerland).

20. "The rule of deference to Plaintiff's forum is not intended to disadvantage foreign plaintiffs but rather reflects a realistic prediction of the ultimate convenience of the forum." [*Piper Aircraft, 454 U.S. at 254.*] This is particularly true here where defendants' case is entirely based on actions that occurred on US soil. The evidence, witnesses, experts, relevant members of the US government, etc. are all in the northern district of California.

21. Defendants have permanent legal and commercial representation in the USA and have legal attaché in both San Francisco as well as in other States of the Union.

**22.** Plaintiff does not <u>have</u> an alternate forum. In Switzerland plaintiffs cannot self-represent. Plaintiffs could not hire attorneys in Switzerland as the result of the ongoing freeze of their assets by the Swiss defendants themselves.

## EXCEPTION TO SOVEREIGN IMMUNITY OF DEFENDANT SWISS CONFEDERATION

23. It is expected that defendant Swiss Confederation will waive both its immunity and the need for service in relation with the present complaint as defendants have initiated legal action against plaintiffs-citizens of the USA-by reliance on the US-Swiss legal treaty. [*28 U.S.C.S §1605 a(1)*]

24. It was assessed that a sovereign may implicitly waive its immunity for such violations, as violations of human rights, when it ratifies such rights in the first place[2].

25. It is also expected that defendants will respond with the same courtesy to plaintiff's Oliver Hilsenrath repeated and unconditioned waiver of rights when traveling from California to Switzerland for questioning on two separate occasions at the invitation of defendants in this action.

26. Nevertheless, if defendant Swiss Confederation will invoke immunity of a foreign state, such immunity[3] will not stand pursuant to *28 U.S.C.S. § 1605 and § 1607*.

27. Furthermore, (a) the 2 banks involved are defendants' instrumentality; (b) the 2 banks have solicited and continue to solicit business in the United States (c) defendant interfered with plaintiff's business in the same banks; (d) defendants and their instrumentalities have breached plaintiffs constitutional rights, specifically the 4th, 5th and 6th amendments; (e) plaintiffs and their instrumentalities disobeyed several specific orders of the District Court in the

---

[2] "A number of legal scholars have examined this principle in the context of human rights violations, and have concluded that a sovereign may implicitly waive its immunity for such violations when it ratifies human rights agreements." R. Lillich and F. Newman, *International Human Rights: Problems of Law and Policy* (1979); Comment, *The Foreign Sovereign Immunities Act and International Human Rights Agreements: How They Co-Exist*, 17 U.S.F. L. Rev. 71 (1982).

[3] Cassirer v. Kingdom of Spain, 461 F. Supp. 2d 1157: -- "taken in violation of international law" contains no limitation on a court's exercise of jurisdiction to sovereigns that were involved in the initial taking, and no such limitation should be implied.

Foreign Sovereign Immunity Act cases have examined the meaning of the phrase "property taken in violation of international law" and have held that if a taking violates any one of the following proscriptions, it violates international law. These proscriptions include injury resulting from: (1) a taking by the state of the property of a national of another state that: (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation.

1  subject matter[4]; (f) plaintiffs and their instrumentalities –
2  the banks – wish to do business in the United Sates while at
3  the same time violating the US constitution and acting against
4  US Federal court orders.

5  **THE PARTIES**

6  **Plaintiffs**

8  28. Plaintiffs 1 to 7 are United States citizens and residents of
9  the State of California.

10  - Plaintiffs 1 and 2, Hana and Oliver Hilsenrath are both
11  scientists with high academic degrees.
12  - Hana Hilsenrath has devoted her last 25 years solely to
13  raising the family's 6 children and had at no time, any
14  involvement in Mr. Hilsenrath's businesses.
15  - Plaintiffs 3 to 7 are the children of the Hilsenrath
    couple. Plaintiffs 4 to 7 are minors.

---

[4]<u>21 August 2006 Order-District Court:</u> "The United States federal government has
now concluded that these frozen assets were not embezzled or stolen. The United
States Federal government has also concluded that these frozen assets were not
the proceeds of a securities fraud offense.
The Court requests that the Swiss investigating magistrates withdraw their
requests for freezes made to other European jurisdictions."

<u>13 Nov 2006 Order-District Court:</u> "The Court clarifies that there is no other
mechanism (other than the issuance of this order) to pronounce on the propriety
of the asset freeze. If the assets had been frozen in the United States, and the
Court issued a similar order holding that there was no probable cause to freeze
the assets, then the assets would have to be released and returned to Mr.
Hilsenrath.
The Court asks the Swiss examining magistrates to deem it's August 21, 2006,
order a final order, not subject to any other judgment or plea.
Consequently, the Court reiterates its request to the Swiss authorities to
release Mr. Hilsenrath's frozen funds and to withdraw their requests for freezes
made to other European countries, to the extent that the Swiss authorities'
freeze of assets is attributable to their mistaken conclusion that there are
violations of U.S. law that justify Swiss money laundering charges."

- Plaintiff 8 represents the liquidated estate of Mr. Hilsenrath's parents assigned originally to the grandchildren.

29. Plaintiffs' assets were unlawfully traced, located and frozen by defendants.

30. The funds of plaintiff number 8 were liquidated against their charter.

31. The liquidated estate of plaintiff 8 was the Hilsenrath family's last source of funds amid the open ended Swiss hold of assets.

**Defendants**

32. Defendant Swiss Confederation is a sovereign government on behalf of which The Swiss Federal Attorney General (SFAG), SAUTEBIN and HOLTKAMP are acting.

33. Defendant Swiss Federal Attorney General (SFAG) has formally launched a legal action (including in the United States[5]), a formal investigation, and an international freeze of assets.

34. Defendants Gerard Sautebin (SAUTEBIN) and Brent Holtkamp (HOLTKAMP) are employees of the Swiss Confederation and were/are in charge of the so-called investigation against the Hilsenraths. This investigation in its 3rd year, now, is the pretext for the sweeping international search and freeze of assets.

35. Defendants harmed plaintiffs by means of mutual legal assistance treaties – MLAT's), including the MLAT with the United States of America.

36. The Swiss Confederation allowed SAUTEBIN and HOLTKAMP access to its network of MLAT's (Mutual Legal Assistance Treaty), the Hague convention treaties and to the INTERPOL.

---

[5] Proceeding QJIF/VU.2005.18 – [Swiss] Federal Attorney General v. Mr. Oliver HILSENRATH

37. The Swiss treaties with the United States, made it possible to retrieve documents, access accounts, enact freeze and forfeiture orders of assets and act beyond Swiss jurisdiction including in California, and indirectly in other states of the USA.

38. Does 1-10 are other direct and indirect persons materially acting with or on behalf of defendants 1 to 4 to effect the freeze of assets, invade plaintiffs privacy, defame plaintiffs in 8 jurisdictions, including in the United States of America, manipulate and diminish the value of the aforementioned funds and assets.

39. In spite of the tens of interrogations, international freezes, destruction of property, international arrest warrants, defendants (Swiss government) never brought actual charges against plaintiffs (the Hilsenraths).

### DEFENDANTS' COURSE OF CONDUCT

40. In April 2005 the Swiss Confederation initiated a freeze of assets held by the Hilsenraths in two banks: Credit Suisse and UBS. Both banks have businesses in both Switzerland and the United States.

41. The Swiss Confederation froze the Hilsenraths' assets under the pretext that those assets were stolen from a California based company.

42. HOLTKAMP and others, operating on behalf of the Swiss Confederation, launched a process of seizing documents held by the two banks and tracing all business relationships in the history of the Hilsenraths' accounts from 1994 to 2007.  The objective was to freeze assets of alleged partners or co-conspirators of the Hilsenraths in at least 8 different countries.

43. In May 2005, only one month later, HOLTKAMP received his first transmission of a finding by the District Court in California that the Hilsenraths' funds in Switzerland are in fact not the result of an alleged theft.

44. In disregard of this information HOLTKAMP and his colleagues embarked on a process of tracking Hilsenrath business partners, sending Swiss police agents to persons in/and outside Switzerland for interrogations and freezing those persons' assets under alleged suspicion of conspiring with the Hilsenraths and laundering stolen money.

45. In July and August 2005 on two different occasions and at HOLTKAMP's request, Oliver Hilsenrath traveled from the US for 6 days of interrogation in a closed facility of the Swiss government in Bern.

46. At the end of the above interrogations, HOLTKAMP concluded in letters to the US and to Hilsenrath, that he received from Hilsenrath ample information and that he does not have a reason to believe that the Hilsenraths transferred illegally obtained assets to Switzerland.

47. He promised in those same letters to lift the freeze on assets within 3 days. The assets remain frozen till this very day, 25 months later.

48. In the summer of 2005, while HOLTKAMP was concluding that no illicit act is likely to have occurred on Swiss soil, two unidentified agents of the Swiss Confederations visited several foreign countries to investigate a number of alleged Hilsenrath money laundry partners (defendants Doe 1 and 2).

49. They communicated to local authorities that they are investigating an international money laundry ring that has transferred over $11 million of illegally obtained US funds through Switzerland.

50. The result of that trip was more financial damage: closure of several additional businesses, revocation of additional lines of credit to businesses, and significant embarrassment to plaintiffs in this case.

51. Some of the investigated persons on that trip were obligated to sell personal business assets and deposit large sums in suspicious, untraceable government accounts.

52. Meanwhile, tens of letters and orders were sent to the Swiss government from the US government and from the California District Court, beginning January 2006.

53. Those letters and orders were stating that the freeze is an error and it is wrongful.

54. The Swiss remained silent. They carefully avoided updating the 8 affected jurisdictions, keeping them in the dark on the US government findings and messages.

55. The funds were never returned to their owners.

### CHRONOLOGY OF DEFENDANT'S ACTIONS

56. In or about May 2005, the Swiss Confederation ordered all assets of the Hilsenrath's - internationally - to be frozen. This includes Switzerland and 8 other countries in which the Hilsenrath's ever transferred funds or made payments.

57. In July and in August 2005, Oliver Hilsenrath traveled to Switzerland and interviewed for 6 days on matters related to his career, life, business, and family, while supplying thousands of pages of personal records.

58. Swiss investigator HOLTKAMP and his team were satisfied that the Hilsenraths in Switzerland deposited no proceeds of theft.

**59.** On 23 August 2005, immediately pursuing to Oliver Hilsenrath's last day of interrogation, HOLTKAMP wrote the following to Bjorn Bajan, then Hilsenrath's attorney in this matter:

1
2

**23 August 2005 - HOLTKAMP to (then)Hilsenrath's attorney:**

3
4
5
6
7
8

**"I refer to the above-mentioned criminal matter and the interrogations of your client on the 15th and 16th August 2005. I hereby inform you that I will render shortly a formal decision for the lifting of the attachments, the original of which will be transmitted (without foundation and the findings of law) to the foreign authorities, which have been put in place by the Federal Prosecutor following the letterogatory."**

9
10
11
12
13
14

60.  Till this very day, 22 months after the date of this letter, the assets remain frozen. The mentioned letter was never issued. More assets were traced and frozen after the date of this letter. More businesses shattered, more police raided homes and offices of innocent persons in multiple countries, more assets destroyed – all on orders of defendants' Swiss Confederation.

15
16
17
18
19
20

61.  The two-faced Swiss government tactic continued undisturbed. On 29 September 2005, HOLTKAMP wrote another letter, this time to the US Central Authority in Washington DC, reporting that he cannot find anything wrong about the Hilsenrath assets in Switzerland and cannot verify any criminal act at the (American) origins of the Hilsenrath funds:

21
22

**29 September 2005  - HOLTKAMP to US/Office of International Affairs (OIA)**

23
24
25
26

**"Oliver HILSENRATH was interviewed on four occasions and has given extensive information and explanations pertaining to his alleged involvement in the criminal activities committed while he was an executive member of U.S. WIRELESS CORPORATION (hereafter USWC), actually bankrupt.**

27
28

**During his interviews he gave a number of responses and provided a large amount of documentation which has been thoroughly**

> **reviewed by our financial analyst, who saw no discrepancies with the facts as stated by Oliver HILSENRATH in regards with the sale of 350'000 stocks of USWC and the subsequent transfer of the resulting proceeds to Swiss bank accounts.**
>
> **The abovementioned analysis, in addition to the proceedings of April 19, 2005, and your clarifying and supplemental request to Switzerland of August 2005, in both of which it seems to be stated that the 350'000 stocks of USWC were legitimately acquired and are therefore not encompassed in the government's indictment, renders improbable any money-laundering activity committed in Switzerland. This is also due to the fact that the proceeds of the afore-mentioned 350'000 stocks account for the major amounts of currency transferred to Switzerland before being forwarded to other States."**

62.  Till this very day, 21 months after the date of this letter, the assets remain frozen.

63.  In December 2005, HOLTKAMP transferred the so-called investigation and the frozen assts to another Swiss employee, SAUTEBIN. SAUTEBIN started the questioning of the Hilsenrath affairs from square one and invited Oliver Hilsenrath to a new set of interrogation, this time in Geneva in May 2006. Hilsenrath agreed, as before with HOLTKAMP, to travel and meet SAUTEBIN. SAUTEBIN kept rescheduling, and purposely avoiding, the interrogation that ultimately never happened till this very day.

64.  On 2 June 2006, the United States Office of International Affairs in Washington DC wrote to the Swiss Central Authority:

> **2 June 2006 – US/OIA to Swiss Gov.**
>
> **"Please advise the Swiss authorities that we are seeking to have the freeze lifted immediately on all [Hilsenrath] funds."**

65. SAUTEBIN did not comply with the US information and Court orders.

66. SAUTEBIN instead started at this point to question the competence of the US government officials that investigated the propriety of the Hilsenrath transactions.

67. In response, the OIA in Washington wrote to SAUTEBIN on 18 July 2006 as follows:

> **18 July 2006 – US/OIA to SAUTEBIN**
>
> **"*    * When we consulted with a securities expert later, he told us that these disclosures meant that there was not a problem from the SEC's perspective with the sale of the stock. Our expert is a former Commissioner at the United States Securities and Exchange Commission, is a tenured faculty member at one of the top three law schools in the United States, and sits on the board of directors of a major technology company in the United States.**
>
> **\*    * [T]he Court here has asked that the Swiss authorities act expeditiously. We would appreciate knowing as soon as possible - preferably by the end of the month - whether the Swiss authorities will release the assets."**

68. The freeze was in its 15th month and the crunch on the Hilsenraths and their partners continued.

69. SAUTEBIN replied that he would not remove the freeze unless he receives from the US government more records on the Hilsenraths, on top and above the tens of thousands of documents transmitted in the (then) year and a half.

70. On 31 July 2006, the US Department of Justice replies to the Swiss with a firm request to release the hold on the Hilsenrath assets throughout Europe. The US government states this time firmly: NO more papers…

**31 July 2006 – US/OIA to Swiss Gov.**

"It is wrong for the Swiss authorities to continue to freeze Mr. Hilsenrath's assets. Justice requires that Mr. Hilsenrath have access to his money so that he can defend himself with the assistance of counsel. I do not understand why the Swiss Examining Magistrate continues – over my objections and over the Court's objections – to freeze Mr. Hilsenrath's money based on a mistaken conclusion by a junior prosecutor that the stock shares were sold in violation of U.S. securities and fraud laws. * * * Again, I ask M. SAUTEBIN to release the assets immediately and to withdraw his holds on the other assets that Mr. Hilsenrath has in Europe.

Mr. SAUTEBIN also asks for more records. I have already given Mr. SAUTEBIN all of the evidence in our possession."

71.  The freeze was now in its 15th month and no relief to Hilsenrath, his family and partners.

72.  The irrational, collective punishment of the Hilsenraths continued.

73.  To remove any possible doubt of the proper nature of the Hilsenrath funds transferred in the course of business to Switzerland, Federal District Judge William H. Alsup signed an order pursuant to Civil Rule 65 making a finding as to the proper nature of the Swiss frozen assets. Judge Alsup writes on 21 August 2006 requesting specifically to remove the hold on assets throughout Europe:

**21 August 2006 –US/District Court to Swiss Gov.**

"The United States federal government has now concluded that these frozen assets were not embezzled or stolen. The United States Federal government has also concluded that these frozen assets were not the proceeds of a securities fraud offense.

> **The Court requests that the Swiss investigating magistrates withdraw their requests for freezes made to other European jurisdictions."**

74. The freeze was now in its 17th month. SAUTEBIN turned the US department of Justice and the District court down again.

75. The time was being utilized by SAUTEBIN's people to continue to force Hilsenraths' partners to sell off joint business assets and deposit them in obscure government accounts - governed by equally obscure regulations.

76. The US Office of International Affairs wrote to SAUTEBIN again on 30 October 2006: OIA told SAUTEBIN's this time (paraphrased) that he is out of line, followed by a painstaking explanation of US law and procedures and the breaches of constitutional rights caused by the Swiss actions.

> **30 Oct 2006 – US/OIA to Swiss Gov.**
>
> **"With all due respect, that conclusion is misplaced. More sophisticated prosecutors have now evaluated the case, and the presiding judge here (an experienced jurist appointed by the President of the United States for a life term) agrees that there was no probable cause to support the freeze of the assets.**
>
> **Gerard SAUTEBIN said that he did not intend to release the funds at this time because he "would like to obtain, previously, a court ruling in the matter by the American Authority (or a plea agreement) regarding Mr. Oliver Hilsenrath." So the Court here issued an order, just as M. SAUTEBIN requested. Now M. SAUTEBIN says that the order he requested is not sufficient because it is not a plea or a sentencing document. Again, with all due respect, the order from the federal judge here is a final order for purposes of the asset freeze. There is no other mechanism in our court system to address the issue of a wrongful freeze. If a judge finds that there is no**

**probable cause to freeze assets, assets are released.**

**While that is standard textbook law on the fourth amendment, I will obtain another court order here saying that."**

77.  With the freeze in its 19th month, Federal District Judge William H. Alsup issues a second order on 13 November 2006, repeating in unequivocal language: This ruling is final and binding. The Hilsenrath funds are legitimately obtained. The Swiss government's freeze of assets in Switzerland and other countries needs to be removed immediately.

**13 Nov 2006 – US/District Court to Swiss Gov.**

**"The Court clarifies that there is no other mechanism (other than the issuance of this order) to pronounce on the propriety of the asset freeze. If the assets had been frozen in the United States, and the Court issued a similar order holding that there was no probable cause to freeze the assets, then the assets would have to be released and returned to Mr. Hilsenrath.**

**The Court asks the Swiss examining magistrates to deem it's August 21, 2006, order a final order, not subject to any other judgment or plea.**

**Consequently, the Court reiterates its request to the Swiss authorities to release Mr. Hilsenrath's frozen funds and to withdraw their requests for freezes made to other European countries, to the extent that the Swiss authorities' freeze of assets is attributable to their mistaken conclusion that there are violations of U.S. law that justify Swiss money laundering charges."**

78.  In the 20th month of the freeze, the Office of International affairs in Washington DC wrote to the Swiss Central Authority

1    and to SAUTEBIN again on 30 November 2006, readdressing for

2    the countless time, the same legitimacy issues of the assets

3    transferred to Switzerland; asking the freeze to be lifted,

4    and stating that the US government will not answer further of

5    the Swiss questions on this matter.

6           **30 Nov 2006 – US/OIA to Swiss Gov.**

7           **"Enclosed is a the letter from the U.S.**
     **Attorney's Office for the Northern District of**
8    **California, both reiterating that the court**
     **there has found no basis for freezing the assets**
9    **in Switzerland under U.S. law, and that its**
     **orders are the equivalent of a final, binding**
10   **order. The letter also responds to the request**
     **of the Swiss magistrate for information from the**
11   **SEC related to this matter.**
12

13   **\*   \*   \* The SEC has not asked for any of**
     **Oliver Hilsenrath's assets to be frozen, either**
14   **here in the United States or abroad. \*   \*   \***
     **Thus, we do not consider any further requests**
15   **from the Swiss Examining Magistrate to be**
     **appropriate, either to the U.S. Attorney's**
16   **Office or to the SEC.**
17

18   **We, in support of the U.S. Attorney's office,**
     **have written numerous letters, provided complete**
19   **documentation and information, and (as the Swiss**
     **examining magistrate requested) obtained the**
20   **court orders verifying that the assets are not**
     **subject to restraint and would be released to**
21   **Mr. Hilsenrath if they were in the United**
     **States. We therefore ask the Swiss authorities**
22   **to release the assets and to withdraw its holds**
     **on Mr. Hilsenrath's assets elsewhere in Europe."**
23

24   79.  Six more months are passing. The Swiss government did not

25   release the assets or even allow for the assets to be orderly

26   managed in violation of Swiss law[6].

27   _____

     [6] <u>Bundesamt für Justiz [Federal Judicial Authority – citing rules to</u>
28   <u>manage frozen assets]</u>: "The assets must continue to be administered and
     invested according to customary bank principles. In particular existing

80. The unlawful Swiss sponsored "collection" of funds from Hilsenraths' partners has continued undisturbed, two years after the beginning of the freeze.

81. The large Hilsenrath family struggles under the weight of the Swiss inexplicable action.

**82.** Two years, 24 months into the freeze, the US department of Justice writes to the Swiss Central Authority and to SAUTEBIN again on 1 May 2007 to lift the "wrongful" freeze:

> **1 May 2007 – US/OIA to SAUTEBIN**
>
> **"I am writing to follow up on my March 9, 2007 letter responding to the Swiss Examining Magistrate's letter dated February 27, 2007. I have not received any reply from the Swiss authorities about the status of the assets.**
>
> **I once again ask the Swiss Examining Magistrate to lift the wrongful freeze of Mr. Hilsenrath's assets. I also would appreciate a status report about what is happening with the assets and the Swiss case so that I can report to the Court here."**

83. At the date of the filing of this complaint, the Swiss unjust and inexplicable freeze is in its 25th month. The Hilsenraths and tens of others were significantly hurt by the Swiss action.

84. Hundreds of thousands of Dollars in legal fees were incurred during this action before plaintiffs ran out of funds.

85. The price of the Swiss action:

86. Tens of Millions of Dollars of lost business assets and opportunities in these painful 25 months.

87. Fear and pain inflicted on the Hilsenraths and tens of other persons by means of undeserved and inexplicable collective punishment.

---

and potential future incoming orders to invest such assets must continue to be executed."

88. The damage to the Hilsenraths ability to conduct business and that of their business partners will follow them into more future personal damage and losses.

### FIRST CAUSE OF ACTION

**(Collective punishment – violation of the 4th and 5th amendment)**

Plaintiffs incorporate each of the above paragraphs by reference.

89. Plaintiffs 1, 3, 4, 5, 6 and 7 were deprived by defendants, Swiss government, of their assets collectively and indiscriminately.

90. Beyond the US constitution, The Forth Geneva Convention (SAUTEBIN's own headquarters) further supported by article 50 of The Hague Regulations, "forbids collective punishment and states that a person shall not be punished for an offense he or she has not personally committed."[7]

91. Plaintiffs 1, 3, 4, 5, 6 and 7 were at no time under any suspicion of any kind by any government including defendants.

92. Plaintiffs 1, 3, 4, 5, 6 and 7 were known to the defendants as being dependents and mostly minors.

93. Plaintiffs 1, 3, 4, 5, 6 and 7 were known to defendants as beneficiaries of the frozen assets.

94. Defendants had repeated, clear written notice that Plaintiffs 1, 3, 4, 5, 6 and 7, Mrs. Hilsenrath and her 6 children, are struggling as the result of the defendants freeze.

95. Defendants turned plaintiffs 1, 3, 4, 5, 6 and 7 down on all pleas for relief.

---

[7] Article 33 of the Fourth Geneva Convention forbids collective punishment and states that a person shall not be punished for an offense he or she has not personally committed. This article explicitly relates to administrative punishment imposed on persons or groups because of acts that they did not personally commit. Article 50 of the Hague Regulations states a comparable prohibition.

96.  Plaintiffs are entitled to this Court's order to compensation in the value of all assets traced and/or seized in value of at least $7.3 million and other damages according to proof.

WHEREFORE, plaintiffs 1, 3, 4, 5, 6 and 7 pray relief as set forth below.

### SECOND CAUSE OF ACTION

**(Violation of 4th and 5th amendment right protecting against unreasonable searches and seizures and the general right to property)**

Plaintiff 2 incorporates each of the above paragraphs by reference.

97.  Defendants searched and seized[8], and froze[9] assets of Plaintiff 2 without basis in law or fact.

98.  Even if the suspicion in 2005 could be articulated in some way, this suspicion had to dissipate once the United States government sent the flow of letters and orders, starting January 2006.

99.  There can be therefore no justification given to the seizure of assets in the last 18 months.

100. Plaintiff 2 is entitled to this Court's order to compensation in the value of all assets traced and/or seized in value of at least $7.3 million and other damage according to proof.

---

[8] <u>United States v. Verdugo-Urquidez, 494 U.S. 259</u>: U.S. Constitution. Amendment IV prohibits unreasonable searches and seizures whether or not the evidence is sought to be used in a criminal trial, and a violation of the amendment is fully accomplished at the time of an unreasonable governmental intrusion

[9] <u>Dayton v. Czechoslovak Socialist Republic, 266 U.S. App. D.C. 177</u>: Under international law, the date of taking is fixed by the date of the expropriation decrees and/or the date of physical seizure, and not by a subsequent date of repudiation of an undertaking to provide compensation

Constitutional rights rest on substance, not on form, and the liability to pay compensation for property taken cannot be evaded by leaving the title in the owner, while depriving him of the beneficial use of the property.

WHEREFORE, plaintiff 2 prays relief as set forth below.

### THIRD CAUSE OF ACTION

**(Recovery of lost property – in violation of the 5th amendment rights - in each of the eight countries in which the Swiss requested freezes and liquidation of assets by means of international diplomatic channels)**

Plaintiffs incorporate each of the above paragraphs by reference.

101. The funds originally held by the Hilsenraths with the Swiss banks were invested in an array of businesses in several countries.

102. All businesses included multiple partners.

103. Defendants closed those businesses and liquidated them by means of international treaties with the mentioned countries.

104. Plaintiffs are entitled to compensations equal to their loss of property pursuant to *California Civil Code Section 3336*[10] in an amount not less than $4.5 million.

WHEREFORE, defendants pray relief as set forth below.

### FOURTH CAUSE OF ACTION

**(Recovery of lost business opportunities – in violation of 5th amendment rights - in each of the eight affected countries)**

Plaintiffs incorporate each of the above paragraphs by reference.

105. Plaintiffs were partners in ongoing businesses in the affected countries.

---

[10]California Civil Code Section 3336: The detriment caused by the wrongful conversion of personal property is presumed to be: First--The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and Second--A fair compensation for the time and money properly expended in pursuit of the property.

106. The businesses had long-term activities, which were disturbed
by defendants' freeze and impeachment.

107. Plaintiffs are entitled to compensations equal to their loss
of business opportunities as the result of defendants' actions
according to proof in an amount not less than $5.9 million.

WHEREFORE, defendants pray relief as set forth below.

### FIFTH CAUSE OF ACTION
#### (Hana Hilsenrath personal damage)

Plaintiff Hana Hilsenrath incorporates each of the above
paragraphs by reference.

108. Hana Hilsenrath is a mother of six children, 4 of whom are
minors, and does not work outside the home.

109. Hana Hilsenrath has never conducted business in or with
Switzerland.

110. Hana Hilsenrath was never accused directly or indirectly of
any impropriety in any jurisdiction in the world.

111. Nevertheless, defendants, the Swiss government, froze her
assets with no stated purpose.

112. As a legal result of the Swiss freeze and related actions she
has suffered fear, anguish, and illness. She has seen the
structure and financial security of her family threatened by
the Swiss action and by the libelous slander of her family.

113. Hana Hilsenrath has lost the vast majority of her personal
wealth. She has suffered general damages in an amount
according to proof.

WHEREFORE, defendant Hana Hilsenrath prays relief as set forth
below.

**SIXTH CAUSE OF ACTION**

**(Recovery of damages as the result of breach of due process in violation of the 6th amendment)**

Plaintiffs incorporate each of the above paragraphs by reference.

114. Defendants SFAG et al. knowingly breached plaintiffs right to due process pursuant to the 6th amendment of the US Constitution.

115. By order of the US federal Court and the US government defendants were urged to release the unjustly frozen assets to allow plaintiffs legal representation in the US as well as in Switzerland.

116. Defendant boldly and repeatedly denied access to plaintiffs' funds even on a partial basis to pay attorneys.

117. While in the US the constitution allows for self-representation (which the Hilsenraths did), in Switzerland the freeze cut plaintiffs off their access to the courts.

118. As the result, plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, defendants pray relief as set forth below.

**SEVENTH CAUSE OF ACTION**

**(Recovery of legal fees in relation to the Swiss freezes)**

Plaintiffs incorporate each of the above paragraphs by reference.

**119.** Before exhausting their finances, the plaintiffs incurred over $650,000 of fees to attorneys in connection to defendant's freeze.

120. Plaintiffs are entitled to recover all legal fees incurred in relation to defendants' actions.

WHEREFORE, defendants pray relief as set forth below.

**EIGHTH CAUSE OF ACTION**

**(Deprivation of plaintiffs' right for liberty in re 5th and 14th amendment – arrest warrant with no due process and no charges; Swiss government's issuance of reckless Interpol arrest warrants)**

Plaintiffs incorporate each of the above paragraphs by reference.

121. In or about April 2005, defendants SFAG issued an international arrest warrant for plaintiff Oliver Hilsenrath without charges or appropriate court orders.

122. The arrest warrant was broadcast through the Interpol computer system throughout 181 countries including the United States of America. The arrest warrant was broadcast throughout the world by means of a process better known as a "RED FLAG".

123. SFAG had no legal basis to issue an arrest warrant.

124. SFAG had filed no charges then, and none till this very day, against defendant Oliver Hilsenrath.

125. Mr. Hilsenrath's home is in California in the same city where the alleged fraud had occurred; he was living with his wife and 5 of their children. He was not contacted about or alerted of the 181-countries-wide arrest warrant.

126. More so, Mr. Hilsenrath agreed to travel to Switzerland several times and answer all questions the Swiss had in relation to his business and indeed did so.

127. Therefore the Swiss had no purpose, other than hurting plaintiffs financially, in issuing an arrest warrant against Mr. Hilsenrath.

128. By doing so defendant impeded plaintiffs to conduct their business and lead a normal life as guaranteed by the 5th and 14th amendment of the Constitution of the United States of America.

129. Mr. Hilsenrath was detained and interrogated on more than a dozen occasions in airports all around the world, including primarily in the United States, as the result of the Swiss

Interpol arrest warrant. He was ultimately released each and
every time, as local authorities - all over the world - saw no
clear purpose in the Swiss' "red flag".

130. Oliver Hilsenrath and the members of his family at home have
continuously suffered fear and anxiety every time a business
or family matter was requiring travel.

131. Plaintiffs have suffered damages in an amount according to
proof.

   WHEREFORE, defendants pray relief as set forth below.

## NINTH CAUSE OF ACTION

**(Loss as the result of the forced liquidation of the Melanie and
André Hilsenrath Trust and constructive trust – 5th amendment)**

   Plaintiffs incorporate each of the above paragraphs by reference.

132. As the result of the Swiss government's freeze of the
Hilsenrath assets in 8 countries, plaintiffs turned to a last
resort liquidation of the Melanie and Andre Hilsenrath trust
(Oliver Hilsenrath's parents).

133. $400,000 was the entire life savings of Melanie and Andre
Hilsenrath[11]. These funds were liquidated to aide the
Hilsenraths Swiss imposed financial struggle, against the
grandparents' wish for the funds to be used for the benefit of
the grandchildren's higher education.

134. Plaintiffs are entitled to compensations equal to their loss
of property pursuant to *California Civil Code Section 3336[12]*

---

[11] Dr. Andre Hilsenrath, Oliver Hilsenrath father, died in April 2006.

[12]*California Civil Code Section 3336:* The detriment caused by the wrongful
conversion of personal property is presumed to be: <u>First</u>--The value of the
property at the time of the conversion, with the interest from that time, or, an
amount sufficient to indemnify the party injured for the loss which is the
natural, reasonable and proximate result of the wrongful act complained of and
which a proper degree of prudence on his part would not have averted; and <u>Second</u>-
-A fair compensation for the time and money properly expended in pursuit of the
property.

WHEREFORE, plaintiffs pray relief as set forth below.

## SCIENTER

135. In addition to abovementioned courses of action, defendants Swiss Confederation, SFAG, HOLTKAMP and SAUTEBIN acted in bad faith and had clear, provable knowledge that the allegations of impropriety against plaintiffs were false and misleading.

136. Defendants knew or recklessly disregarded that the knowingly false and misleading accusations adversely affected the property of plaintiffs, and adversely affected their ability to conduct business, control their lives and maintain their good name and good reputation in their community.

137. Defendants acted knowingly to financially hurt plaintiffs.

## PRAYER

By way of this complaint plaintiffs pray relief as follows:

138. That this Court order defendants to pay plaintiffs 1, 3, 4, 5, 6 and 7 an amount of not less than $7.3 million - equal to all their frozen/traced funds.

139. That this Court order defendants to further compensate plaintiff 2 for all assets that defendants froze and/or attempted to freeze in the amount of not less than $7.3 million.

140. That this Court order defendants to further reimburse plaintiffs the cash value of business assets liquidated in the 8 affected jurisdictions in an amount no less than of $4.5 million.

141. That this Court further order defendants to compensate plaintiffs for loss of ongoing business in the 8 affected jurisdictions and beyond, in this third year of the freeze, in an amount no less than $5.9 million.

142. That Hana Hilsenrath further recovers from defendants' personal damages according to proof.

143. That plaintiffs further recover damages as the result of defendants' breach of due process in violation of the 6th amendment, in both the USA and Switzerland, according to proof.

144. That plaintiffs further recover legal fees incurred in the relation to defendants' actions according to proof in an amount no less than $650,000.

145. That plaintiffs further recover damages resulting from defendants' bogus international arrest warrants according to proof.

146. That the court further orders defendants to restore the funds in the Melanie and Andre Hilsenrath Trust in an amount no less than $400,000.

147. That this Court award such other and further relief as it deems proper.

Dated: May 29, 2007

        Respectfully submitted,


_____/s_____              _____/s_____

  HANA HILSENRATH                  OLIVER HILSENRATH