1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    STEPHAN E. BECKER (*pro hac vice* application pending)
2     Email: stephan.becker@pillsburylaw.com
    2300 N Street N.W.
3   Washington, D.C. 20037-1122
    Telephone:   (202) 663-8277
4   Facsimile:   (202) 663-8007

5   PILLSBURY WINTHROP SHAW PITTMAN LLP
    SHARON L. O'GRADY (SBN 102356)
6     Email: sharon.ogrady@pillsburylaw.com
    50 Fremont Street
7   Post Office Box 7880
    San Francisco, CA 94120-7880
8   Telephone:   (415) 983-1198
    Facsimile:   (415) 983-1200
9
    Attorneys for Defendants
10  THE SWISS CONFEDERATION, THE FEDERAL ATTORNEY GENERAL
    OF SWITZERLAND, GERALD SAUTEBIN AND BRENT HOLTKAMP
11

12

13                 UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16  _____
                                )
17  OLIVER HILSENRATH, ET AL.,  )   Case No. C-07-2782-WHA
                                )
18            Plaintiffs,        )   E-Filing
                                )
19        v.                     )   APPENDIX OF AUTHORITIES NOT
                                )   CONTAINED IN WEST REPORTERS
20  THE SWISS CONFEDERATION, THE )   AND CITED IN DEFENDANTS'
    FEDERAL ATTORNEY GENERAL OF  )   MOTION TO DISMISS COMPLAINT
21  SWITZERLAND, GERARD SAUTEBIN,)   (FEDERAL RULE OF CIVIL
    BRENT HOLTKAMP,              )   PROCEDURE 12(b)(1),(2), AND (6))
22                               )
              Defendants.        )   Date:      September 13, 2007
23                               )   Time:      8:00 a.m.
                                )   Courtroom: 9, 19th Floor
24                               )   Judge:     The Hon. William H. Alsup
                                )
25  _____)

26

27        For the court's convenience, attached to this Appendix are complete and accurate

28  copies of the following authorities cited in the papers submitted by Defendants in support of

                                  - 1 -

1    Defendants' Motion to Dismiss Complaint.  These authorities are reported exclusively on

2    computerized research.

3

### AUTHORITIES

4

*Textainer Equip. Mgmt (U.S.) Ltd. v. TRS Inc.,*                                                    **Tab**

5    2007 U.S. Dist. LEXIS 47527

(N.D. Cal. 2007) ......................................................................................................... 1

6

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES (1987)

7    Section 443, comment a ............................................................................................... 2

8    William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, FEDERAL CIVIL

PROCEDURE BEFORE TRIAL

9    Sections 9:77, 9:113 (2007) ........................................................................................ 3

10

      Dated:  August 6, 2007.

11

12                                              PILLSBURY WINTHROP SHAW PITTMAN LLP

                                                STEPHAN E. BECKER (*pro hac vice* application

                                                pending)

13                                              2300 N Street N.W.

                                                Washington, D.C. 20037-1122

14

15                                              PILLSBURY WINTHROP SHAW PITTMAN LLP

                                                SHARON L. O'GRADY

                                                50 Fremont Street

16                                              Post Office Box 7880

                                                San Francisco, CA  94120-7880

17

18                                              By ___ /s/ Sharon L. O'Grady _____

                                                        Sharon L. O'Grady

19

                                                Attorneys for Defendants

20                                              THE SWISS CONFEDERATION, THE

                                                FEDERAL ATTORNEY GENERAL OF

21                                              SWITZERLAND, GERALD SAUTEBIN

                                                AND BRENT HOLTKAMP

22

23

24

25

26

27

28

# TAB 1

LEXSEE

**TEXTAINER EQUIPMENT MANAGEMENT (U.S.) LIMITED, Plaintiff, v. TRS INC., trading as TRS CONTAINERS and as TRS RESEARCH, Defendants.**

No. C 07-01519 WHA

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2007 U.S. Dist. LEXIS 47527*

**June 20, 2007, Decided**
**June 20, 2007, Filed**

**COUNSEL:** [*1] For Textainer Equipment Management (U.S.) Limited, Plaintiff: William M. Duncan, LEAD ATTORNEY, A Professional Law Corporation, Yreka, CA.

For TRS Inc., trading as TRS Containers and as TRS Research, Defendant: Brian Scott Gocial, Robert Anthony Burke, Blank Rome LLP, Philadelphia, PA; Gail Killefer, Attorney at Law, San Francisco, CA.

**JUDGES:** WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** WILLIAM ALSUP

**OPINION**

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND VACATING HEARING**

**INTRODUCTION**

In this action for breach of contract and other claims, defendants move to dismiss plaintiff's claims under *Rule 12(b)(6)*. Plaintiff has successfully pleaded claims for breach of contract and conversion. Defendants have shown that plaintiff's claims for fraud and intentional misrepresentation are not pleaded with particularity as required by *Rule 9(b)*. Plaintiff argues in its opposition that it actually should have designated its claim for unjust enrichment to be a claim for recovery *in quantum meruit*, thus it will be permitted to amend that claim. Accordingly, defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART.** Plaintiff will be granted leave to amend its claims for fraud, intentional misrepresentation, [*2] and unjust

enrichment. As no further argument is necessary, the hearing on this motion is hereby **VACATED.**

**STATEMENT**

Plaintiff Textainer Equipment Management Limited is a Delaware corporation that, among other things, rents and leases intermodal shipping containers. Defendants TRS, Inc., trading as TRS Containers and TRS Research, is a New Jersey corporation that leases intermodal containers and chassis for use by the United States military and other clients (Compl. PP 6-14).

Sometime around February 2002, Gateway Management Services Limited entered into an agreement to lease defendants a number of intermodal containers. The agreement's effective date was October 1, 2001 (*id.* at P 6). The daily rental rate, the replacement value of the containers, the lease period, and other specifics of the agreement were set forth in documents called the lease addendum and schedules (*id.* at P 8). Each lease addendum covered a specific time period and specified different containers and equipment to be leased at different rates (*id.* at P 9).

The lease agreement listed and described events constituting default. These included (Def.'s Exh. A, P 10(d)):

> (d) Customer attempts to sell, transfer, encumber, part [*3] with possession of, or assign or sublet (except as expressly permitted by the provision of the Agreement) the Containers or any part thereof.

The lease agreement also provided for assignment of the agreement (*id.* at Exh. A, P 12(b)):

(b) Gateway and Owners, and any direct or remote assignee of any right, title or interest of Gateway and Owners under the Agreement, shall have the right at any time or from time to time to assign part or all of its rights, title and interest in and to the Agreement, and upon notice from Gateway or Owners and such assignee, Customer shall immediately make payment of all monies due and to become due or arising out of said agreement to such assignee.

In 2006, Gateway assigned the lease agreement to plaintiff (*id.* at P 11). Prior to July 2006, plaintiff entered into a separate contract with the United States military to compile and operate a database for all intermodal containers leased by the military (*id.* at P 13). While compiling the database, plaintiff discovered that about 620 of the containers leased to TRS under the agreement had been sold to the military (*id.* at P 14). Plaintiff alleges that the first such sale occurred around September 2004 (*ibid.*). [*4] Defendants never told Gateway or plaintiff that the containers had been sold and continued to pay rent under the lease agreement (*id.* at P 15). In the summer of 2006, TRS allegedly told Textainer and Gateway that some of the containers had been lost (*id.* at P 19-20). By September 2006, defendants were in default on the lease. Plaintiff demanded return of the containers, but defendants refused to return the containers or pay the rent owed under the lease agreement (*id.* at P 22).

Plaintiff filed this action on March 16, 2007. The complaint alleges claims for (1) breach of contract for lease rent and for depreciated replacement value of the containers; (2) conversion; (3) intentional representation; (4) fraud; and (5) unjust enrichment. This motion was filed on May 14, 2007.

**ANALYSIS**

A motion to dismiss under *Rule 12(b)(6)* tests for legal sufficiency of the claims alleged in the complaint. "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not [*5] do." *Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (May 21, 2007).* "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a mo-

tion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996).*

**1. BREACH OF CONTRACT.**

Plaintiff's first claim is for breach of contract. "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375, n.6, 11 Cal. Rptr. 3d 412 (2004)* (citation omitted). "Performance under a contract becomes due when all necessary conditions, and the passage of any required time, have occurred so that a failure of performance will be a breach." *Restatement (Second) of Contracts § 224(b).* "Parties may agree that a right or duty is conditional upon the occurrence or non-occurrence of an event." *Platt Pac. v. Andelson, 6 Cal. 4th 307, 24 Cal. Rptr. 2d 597, 862 P.2d 158, 161-62 (1993).*

Defendants [*6] argue that plaintiff has failed to plead a condition precedent that would establish plaintiff's right to payment under the contract. Defendants allege that a provision in the lease agreement requires notice by *both* Gateway and plaintiff to defendants of any assignment of the lease agreement. Defendants' duty to pay an assignee is not triggered until and unless written notice is given to defendants by both the assignor and assignee. Plaintiff did not plead the fulfilment of this condition, defendants contend, because plaintiff merely pleaded that there was an assignment.

In the complaint, however, plaintiff pleads that it "has performed all obligations under the Lease Agreement due and owing to defendants and/or Lessee, except for those which Plaintiff was prevented or excused from performing" (Compl. P 33). Here, taking all of plaintiff's allegations as true, Textainer has pleaded all the necessary elements. It has pleaded that it fulfilled all conditions under the contract. More detail is not necessary at this time. The question of whether plaintiff and Gateway actually gave written notice is a factual dispute that will be developed later in this action. Accordingly, defendants' motion [*7] to dismiss on the claim for breach of contract is **DENIED**.

**2. CONVERSION.**

Plaintiff's second claim is for conversion. "The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property right; and damages." *Oakdale Village Group v. Fong, 43 Cal. App. 4th 539, 543-544, 50 Cal. Rptr. 2d 810 (1996).* "Conduct amounting to a

breach of contract becomes tortious only when it also violates a duty independent of contract law." *Erlich v. Menezes, 21 Cal. 4th 543, 551, 87 Cal. Rptr. 2d 886, 981 P.2d 978 (1999).* A breach of contract, however, can be tortious when accompanied by a traditional common law tort, such as fraud or conversion. *Id. at 543-44.*

TRS contends that their actions in selling the containers to the military did not go beyond their rights under the contract, so plaintiff may only recover economic damages on the contract. TRS claims that the contract specifically contemplated the sale of the containers to the military. This, however, is a fact question better resolved on summary judgment than on the pleadings. Plaintiff pleaded that it owned the containers at the time of the conversion, that defendants wrongfully [*8] sold the containers to the military, and that plaintiff was damaged. TRS also argues that it had no independent duty of care not to convert the containers. This argument makes little sense. Conversion is an intentional tort that requires no proof of an independent duty. Moreover, parties to contracts are expected to understand the risks allocated by contract, but are not expected to anticipate fraud and dishonesty. *Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal. 4th 979, 993, 22 Cal. Rptr. 3d 352, 102 P.3d 268 (2004).* Textainer had no reason to enter into a contract believing that defendants would sell the containers and then conceal their actions.

Defendants cite *McGehee v. Coe Newnes/McGehee ULC, 2004 U.S. Dist. LEXIS 22931, 2004 WL 2452855 (N.D. Cal. 2004)* (Jenkins, J.), for the proposition that plaintiff cannot plead a claim for conversion where the relationship is governed by a contract. That decision involved a contract to develop and possibly market equipment. The deal eventually cratered. The plaintiffs filed an action for breach of contract; the defendants counterclaimed for conversion. The court dismissed the conversion counterclaim because there was no independent duty in tort other than the duties by the contract. *Id.* at *3. This [*9] decision is distinguishable because here, TRS had an independent duty not to misappropriate the containers. This duty existed outside the contract. Taking plaintiff's allegations as true, it can recover on a claim for conversion. Accordingly, plaintiff has stated a claim for conversion, and defendants' motion to dismiss is **DENIED** as to that claim.

### 3. FRAUD.

Plaintiff next claims that defendants committed fraud by concealing the sale of the containers. "The elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974, 64 Cal. Rptr. 2d 843, 938 P.2d 903 (1997)* (internal citations and quotations omitted). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *FRCP 9(b); see also Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1106 (9th Cir. 2003).* "A pleading is sufficient under *Rule 9(b)* [*10] if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. While statements of time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (1989).*

Defendants are correct in their assertion that plaintiff's fraud claim by itself does not contain any specific allegations, it merely incorporates by reference the previous paragraphs in the complaint. There is nothing wrong with doing so, provided that plaintiff has pleaded all necessary elements in the preceding paragraphs.

Plaintiff alleges that the containers were leased to defendant who never purchased them, that defendants sold the containers to the military without authorization and without informing plaintiff, hid their actions, and then stopped paying lease rent when their activities were discovered. In the rest of the complaint, plaintiff does not identify any particular statement that defendants made that was fraudulent, nor did it allege when any such statements took place. Similarly, plaintiff does not allege with specificity that defendants [*11] omitted to tell Textainer of the alleged sale or conversion of the containers. Given plaintiff's allegations, defendants would be hard-pressed to know what specific conduct or statements plaintiff alleges were false or misleading. Accordingly, plaintiff has not pleaded its fraud claim with the particularity required by *Rule 9(b)*, and defendants' motion is **GRANTED**.

### 4. INTENTIONAL MISREPRESENTATION.

Plaintiff also brings a claim for intentional misrepresentation. Under California law, the elements of a claim for intentional misrepresentation are: (1) a misrepresentation, including a concealment or a nondisclosure; (2) knowledge of falsity of the misrepresentation; (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance; and (5) damages. *Cadlo v. Owens-Illinois, Inc., 125 Cal. App. 4th 513, 519, 23 Cal. Rptr. 3d 1 (2004).* The elements are very similar to a claim for fraud, and so a claim for intentional misrepresentation is also subject to the heightened pleading standard of *Rule 9(b)*. "The general rule for liability for non-disclosure is that even if material facts are known to one party and not the other, failure to disclose those facts

is not actionable fraud unless there is some  [*12] fiduciary or confidential relationship giving rise to a duty to disclose. However, active concealment of facts and mere nondisclosure of facts may under certain circumstances be actionable without such a relationship." *La Jolla Village Homeowners' Assn. v. Superior Court, 212 Cal. App. 3d 1131, 1151, 261 Cal. Rptr. 146 (1989).*

Here, plaintiff argues that the misrepresentation at issue was that defendants continued to pay lease rent on the containers after they had allegedly sold them. As with plaintiff's claim for fraud, plaintiff has not pleaded the elements of a fraud claim with sufficient specificity. Accordingly, defendants' motion to dismiss is **GRANTED** as to the claim for intentional misrepresentation.

### 5. UNJUST ENRICHMENT.

Textainer's final claim is for unjust enrichment. Plaintiff, in its opposition, contends that its claim for unjust enrichment should have been labeled a claim for recovery in *quantum meruit*, or quasi-contract, and not a claim for unjust enrichment. Plaintiff will be granted leave to amend its complaint and may rename or replead this claim as it sees fit.

### 6. TRS RESEARCH.

Defendants argue that TRS Research should be dismissed because only TRS, Inc., was a party to the contract at issue  [*13] in this action. Assuming that TRS, Inc., and TRS Research are in fact both proper defen-

dants, defendants' argument neglects that plaintiff has alleged claims other than breach of contract. In response, plaintiff contends that TRS Research was listed as a "doing business as" name, and not an actual party to this action. After receiving defendants' initial disclosures, plaintiff states that it may, if necessary, seek leave to add or delete parties from this action. At this time, defendants have not succeeded in demonstrating that TRS Research is not a proper defendant. Accordingly, defendants' motion to dismiss all claims against TRS Research is **DENIED.**

### CONCLUSION

For all of the above-stated reasons, defendants' motion to dismiss is **DENIED** as to plaintiff's claims for breach of contract and conversion, and **GRANTED** as to plaintiff's claims for fraud, intentional misrepresentation, and unjust enrichment. Defendants' motion to dismiss all claims against TRS Research is **DENIED.** Plaintiff will be allowed leave to amend, and the amended complaint should be filed no later than **JULY 21, 2007.** Further dismissal motion practice is discouraged but not barred. Seeing no need for further oral argument,  [*14] the hearing on this motion is **VACATED.**

**IT IS SO ORDERED.**

Dated: June 20, 2007.

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

# TAB 2

Westlaw.

C

Restatement of the Law -- Foreign Relations Law of the United States
Restatement (Third) of Foreign Relations Law of the United States
Current through April 2007

Copyright © 1987-2007 by the American Law Institute

Part IV. Jurisdiction And Judgments
Chapter 4. Jurisdiction And The Law Of Other States
Subchapter B. The Act Of State Doctrine

§ 443. Act Of State Doctrine: Law Of The United States

Link to Case Citations

(1) In the absence of a treaty or other unambiguous agreement regarding controlling legal principles,
courts in the United States will generally refrain from examining the validity of a taking by a foreign state of
property within its own territory, or from sitting in judgment on other acts of a governmental character done
by a foreign state within its own territory and applicable there.

(2) The doctrine set forth in Subsection (1) is subject to modification by act of Congress. See § 444.

Comment:

*a. Origins and rationale of act of state doctrine.* The act of state doctrine as set forth in this section is derived
from two statements by the Supreme Court of the United States. In Underhill v. Hernandez, 168 U.S. 250, 252, 18
S.Ct. 83, 84, 42 L.Ed. 456, 457 (1897), the Supreme Court said:

  Every sovereign State is bound to respect the independence of every other sovereign State, and the courts
  of one country will not sit in judgment on the acts of the government of another done within its own territory.
  Redress of grievances by reason of such acts must be obtained through the means open to be availed of by
  sovereign powers as between themselves.
In 1964, in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804, 823-24
(1964), the Supreme Court, building on Underhill and intervening cases, held that "the Judicial Branch will not
examine the validity of a taking of property within its own territory by a foreign sovereign government [subject to
certain possible limitations]."

The act of state doctrine derived from these cases has been a subject of controversy and uncertainty, and some
limitations and exceptions have been developed. It has been urged that the doctrine should be limited to cases, such
as Sabbatino, involving expropriation by a foreign state of property located in its territory, but Underhill applied the
doctrine to a suit for damages for assault and detention by a foreign military commander, and that precedent as well
as the rationale of the doctrine have led lower courts to apply it in some cases not involving property. See Comment
*c* and Reporters' Notes 3 and 7. Even as to expropriation cases, Sabbatino itself suggested possible limitations on the
act of state doctrine, and some Justices of the Supreme Court have sought to limit it further. See Comment *b*. For the
statutory limitation on application of the doctrine, see § 444.

The rationale for the doctrine has been variously described. The doctrine was developed by the Court on its own
authority, as a principle of judicial restraint, essentially to avoid disrespect for foreign states. "To permit the validity

Copr. © 2007 The American Law Institute.

of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" Oetjen v. Central Leather Co., 246 U.S. 297, 304, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). Thus, the doctrine is related in spirit to the rules of international law that accord to foreign sovereigns large immunity from adjudication in domestic courts. See Reporters' Note 11; see also § § 451-460. In Sabbatino, the Court said that the act of state doctrine is compelled neither by international law nor by the Constitution, but that it has "'constitutional' underpinnings," 376 U.S. at 423, 84 S.Ct. at 937. The Court referred to the doctrine as "concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community." 376 U.S. at 425, 84 S.Ct. at 938. The Court's statement in Underhill implies that disputes arising out of foreign acts of state should be resolved between governments. The act of state doctrine therefore also reflects deference to the Executive Branch, akin to the political question doctrine. See § 1, Reporters' Note 4. Where the act of a foreign state is challenged under international law, as in Sabbatino, the lack of consensus on the relevant content of that law has contributed to the Court's reluctance to entertain such a challenge. See § 712, Reporters' Note 1. Courts and commentators have stressed one or another of these bases for the doctrine, and the weight given to the different bases may determine possible limitations or exceptions. See Comments b, c, and h. For comparable policies in other countries, see Reporters' Note 12.

The act of state doctrine does not apply to challenges in courts in the United States to the validity or legality of acts of the United States Government.

*b. Scope of act of state doctrine and exceptions.* In the principal contemporary formulation of the doctrine, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), Justice Harlan wrote:

> [R]ather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 428, 84 S.Ct. at 940, 11 L.Ed.2d at 823-24.

The Sabbatino case involved property taken by the government of a recognized state within its own territory, and the legal challenge to the taking was founded on a principle of customary international law as to which there was substantial controversy, not on a treaty or other unambiguous agreement. The Court said "we decide only . . ." the kind of case before it, and it is not clear whether it intended to limit application of the act of state doctrine to situations in which all of the conditions listed are present. The applicability of the doctrine where one or more of those conditions is not present should be determined in the light of the reasons for the doctrine. See Comment *a*.

As of 1987, the Supreme Court had not passed on the applicability of the doctrine to an act of a foreign government in respect of property outside that state's territory; to an act of a government not recognized by the United States, to an act alleged to violate a provision of a treaty or other unambiguous agreement, or a principle of customary law not in dispute. Since Sabbatino, the Supreme Court has not had occasion to apply the doctrine to a case not involving the taking of property, as it had done in Underhill.

Lower courts have been unanimous in holding that the act of state doctrine does not apply to a taking by a foreign state of property outside of its territory at the time of taking, but have been divided as to how the territorial limitations should be applied to intangible property. See Reporters' Note 4. The doctrine has been held inapplicable in the context of a challenge to a taking by a foreign state alleged to be in violation of a treaty between the United States and that state. See Reporters' Note 5. In Sabbatino, the Court stressed that the principles of international law on which the challenge to the foreign state's act was based were in sharp dispute, 376 U.S. at 428-30, 84 S.Ct. at 940-941, 11 L.Ed.2d at 824-25, see § 712, Reporters' Note 1; it has been argued that the doctrine was not intended to preclude review of an act of a foreign state challenged under principles of international law not in dispute, but as of 1986 no such case had been decided. No post-Sabbatino case has considered application of the doctrine to acts by an unrecognized state or government. A divided Supreme Court has held that the doctrine would not preclude a counterclaim against the foreign state in certain circumstances. See Reporters' Notes 2 and 9.

*c. Applicability of act of state doctrine to cases not involving expropriation.* The Sabbatino case involved a taking of private property, and the act of state doctrine has been applied predominantly to such acts, whether

Copr. © 2007 The American Law Institute.

challenged by claims to title to the property taken or claims for compensation for the taking. Challenges in United States courts to other types of acts by foreign states may also bring the doctrine into play. Compare Underhill, Comment *a*, and see Reporters' Notes 3 and 7. In general, whether a particular act of a foreign state not involving expropriation comes under the act of state doctrine depends on the extent to which adjudication of the challenge would require the United States court to consider the propriety of the acts and policies, or probe the motives, of the foreign government. A claim arising out of an alleged violation of fundamental human rights--for instance, a claim on behalf of a victim of torture or genocide--would (if otherwise sustainable) probably not be defeated by the act of state doctrine, since the accepted international law of human rights is well established and contemplates external scrutiny of such acts. See § § 701-703. Whether, as suggested by four Justices in Dunhill, Reporters' Note 6, the act of state doctrine is inapplicable to commercial acts of foreign states, such as ordinary breaches of contract or warranty of product or title, has not yet been decided.

   *d. Validity of act of state under foreign or international law.* The act of state doctrine precludes judicial examination of the lawfulness of a taking by a foreign state of property located in its territory, whether under the law of that state, under international law, or under the law or policy of the forum. Thus, courts in the United States will not entertain challenges to the validity or lawfulness of a taking by a foreign state on the ground that it was contrary to the state's own constitution or laws, or that a law or decree had not been properly enacted. In Sabbatino, the court refused to examine the validity of a taking under international law. By subsequent act of Congress, the doctrine has been modified so that it does not preclude judicial examination of the validity of a taking under international law in certain circumstances. See § 444.

   *e. Consent of foreign state to judicial scrutiny.* Since the act of state doctrine is a judicial policy of self-restraint, the application of the doctrine cannot be "waived" by the foreign state. However, insofar as the act of state doctrine is designed to reflect respect for foreign states, indications of consent to adjudication by the courts of another state are highly relevant, though they are not conclusive, since the doctrine also reflects judicial deference to the Executive Branch of the United States and the courts' sense of their lack of competence. When a state has expressly subjected certain kinds of obligations to adjudication in the courts of another state, or to international arbitration (§ 487), it may be said to have acknowledged that its acts with respect to those obligations take place in the international arena and are subject to international scrutiny; in such cases the justification for applying the act of state doctrine is significantly weaker. Thus, for example, if a foreign state takes out or guarantees a loan from commercial banks payable in New York and consents to adjudication of any disputes concerning the loan in New York courts, those courts may well consider that action by the state to repudiate or postpone payment on the loan is subject to their scrutiny. See § 822, Reporters' Note 6. Similarly, a dispute under a mining concession containing a clause calling for commercial arbitration in a neutral state would generally be considered to be arbitrable, and litigation in the United States to compel arbitration or to enforce an arbitral award should not be subject to the act of state doctrine. See § 488, Reporters' Note 1. In contrast, if an alien places funds on deposit in a foreign state and thereafter the government of that state adopts new rules of general application limiting the amount or the currency that may be withdrawn, the state has not (without more) agreed to consider the deposit to be subject to international rules or to submit its acts to international scrutiny, and the act of state doctrine would probably apply to a suit in the United States by the depositor. See Reporters' Notes 4 and 6.

   *f. Effect on proceedings in other countries.* The fact that pursuant to the act of state doctrine the validity of an act of a foreign state was not examined and was given effect by a court in the United States is not dispositive in proceedings brought elsewhere as to the validity of the act either under international law or under applicable municipal law. Thus a challenge to an expropriation brought in a court in the United States and met by application of the act of state doctrine would not preclude a challenge to the same act in the courts of the acting state, in the courts of a third state, or in an international adjudication or arbitration. Enforcement in the United States of a foreign judgment or arbitral award should not be refused because that forum did not apply the act of state doctrine.

   *g. Act of state doctrine as United States law.* In Sabbatino, the Court said that the act of state doctrine, addressing an "issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community, must be treated exclusively as an aspect of federal law." 376 U.S. at 425, 84 S.Ct. at 938, 11 L.Ed.2d at 822. While Congress may alter the doctrine, Subsection (2) and § 444, State courts are bound by the federal doctrine, and a decision of a State court sitting in judgment on the act of a foreign state would be subject to review by the Supreme Court.

Copr. © 2007 The American Law Institute.

*h. Role of Executive Branch.* To the extent that advice to the court from the Executive Branch expresses national policy concerning the existence of, recognition of, or maintenance of diplomatic relations with, another state, see §§ 202-205, declarations by the Executive Branch are dispositive. The Supreme Court has divided on the question whether expressions of the Executive Branch concerning the appropriateness or desirability of applying the act of state doctrine are controlling. See Reporters' Note 8. The argument in favor of deferring to the Executive Branch is that only that branch is in position to judge the effect of judicial examination of a foreign act on the conduct of foreign relations or on relations with a particular state. The opposing argument is that the act of state doctrine is a judicial doctrine for guidance of the courts, and that the primacy of the Executive Branch in foreign relations is but one of the bases for the doctrine. See Comment *a* and Reporters' Note 8. For the effect to be given to Presidential determinations under the statutory exception to the act of state doctrine, see § 444 and Comment *f* to that section. The Executive Branch is, of course, free in any case to submit its views to the court, for example by a brief as amicus curiae.

*i. Form and proof of act of state.* The act of state doctrine applies to acts such as constitutional amendments, statutes, decrees and proclamations, and in certain circumstances to physical acts, such as occupation of an estate by the state's armed forces in application of state policy. An official pronouncement by a foreign government describing a certain act as governmental is ordinarily conclusive evidence of its official character. An action or declaration by an official may qualify as an act of state, but only upon a showing (ordinarily by the party raising the issue) that the official had authority to act for and bind the state. Courts in the United States may take judicial notice of a document evidencing an act of state, or they may, in appropriate cases, call for testimony. A party that intends to rely on the act of state doctrine is required to give notice, in its pleadings or otherwise. See, e.g., Fed.R.Civ.P. 44.1. The burden of establishing the act and its character as an act of state is on the party invoking the doctrine. The act of state doctrine does not preclude an initial inquiry as to whether a challenged act is in fact an act of state, whether scrutiny of the act is necessary to a litigant's claim or defense, or whether one of the suggested exceptions to the doctrine applies. In cases in which a state or other party fails to appear or assert the act of state doctrine, the court may itself raise the applicability of the doctrine.

*j. Act of state doctrine subject to controlling statute or international agreement.* The act of state doctrine was created in the United States in a series of judicial decisions, including, as of 1986, at least eight decisions of the Supreme Court. See Comment *a* and Reporters' Note 2. The doctrine has been developed by the courts for their own guidance, but while it has "'constitutional underpinnings,'" Comment *a*, it is not required by the Constitution and is subject to modification by law. Subsection (2). In response to the decision in the Sabbatino case, Comment *a*, Congress adopted a modification of the doctrine. See § 444 and Comment *a* thereto. Presumably, the doctrine is also subject to modification by treaty or other international agreement of the United States. Whether a particular treaty or agreement is intended to create an exception to the doctrine is to be decided by the courts. Whether the act of state doctrine should apply where the state's act is inconsistent with its obligation under a treaty or international agreement is a different question, not yet considered by the Supreme Court. See Comment *b* and Reporters' Note 5.

## REPORTERS' NOTES

1. *Act of state doctrine and conflict of laws.* In most cases, the act of state doctrine may be seen as a special rule of conflict of laws. The normal rule of choice of law in most act of state cases would point to application of the law of the state where the act took place; that rule may be disregarded in certain instances where the law thus chosen would violate the strong public policy of the forum, e.g., a policy against expropriation without compensation. See Restatement, Second, Conflict of Laws § 90. The act of state doctrine requires a court to disregard that public policy and to give effect to the foreign law. In cases involving property, the limitation of the doctrine to acts affecting property within the acting state's territory, Comment *b*, is consistent with the deference to territoriality in conflict of laws doctrine.

2. *Development of act of state doctrine.* The contemporary formulation of the act of state doctrine stems from Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), but the doctrine was reexamined and reformulated in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed. 2d 804 (1964), in the face of both a basic challenge to the doctrine and assertions that the doctrine does not preclude examination of the validity of acts of state claimed to violate international law. The case concerned a draft covering payment for a shipment of sugar from an estate in Cuba that had belonged to a Cuban corporation owned by United States nationals and had been expropriated by the government of Cuba. The draft was presented by Banco Nacional, as

Copr. © 2007 The American Law Institute.

REST 3d FOREL § 443                                                                    *Page 5
Restatement (Third) of Foreign Relations Law § 443 (1987)

agent for Cuba, to the New York broker who had purchased the sugar, and when payment was refused, Banco Nacional brought suit. The former owners caused a receiver (Sabbatino) to be appointed under New York law, and the receiver asserted title to the sugar or its proceeds on behalf of the former owners, on the ground that Cuba's seizure of the estate had been contrary to international law. The receiver prevailed in the district court and the court of appeals, but the Supreme Court reversed (8-1) on the ground that the act of state doctrine did not permit review of the acts of a foreign state done within its own territory.

Shortly after the decision in Sabbatino, Congress adopted the so-called Second Hickenlooper Amendment, excluding from application of the act of state doctrine certain types of actions involving claims of title to property in the United States. See § 444. In First National City Bank of New York v. Banco Nacional de Cuba, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), the Supreme Court again considered the act of state doctrine, in a case where an expropriation was the basis of a counterclaim, Reporters' Note 9, and where there was a communication from the State Department suggesting that the doctrine not be applied, Reporters' Note 8. In a third case arising out of the Cuban revolution, Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed. 2d 301 (1976), the Supreme Court declined to undertake a basic reexamination of the doctrine, but clarified the definition of what constitutes an act of state, Reporters' Note 3. Four Justices suggested the existence of an exception to the doctrine when the act of the foreign state has the character of an ordinary commercial act. Reporters' Note 6. For discussion of another Supreme Court case involving the act of state doctrine, see First National City Bank v. Banco Para El Comercio Exterior de Cuba, Reporters' Note 9.

    3. *Governmental acts within act of state doctrine.* In Dunhill, Reporters' Note 2, the contention was made that the repudiation by a state agency of an obligation to repay sums paid by importers of cigars into the United States constituted an act of state, even without a formal decree or legislative act. The majority of the Supreme Court rejected this contention, and held that the act of state doctrine applies only to formal acts of sovereign authority. An act of state may take the form of a decree, statute, or comparable instrument, or of a statement by someone with authority to exercise sovereign power. A mere default on a contract, or repudiation of an obligation by counsel during a trial, would not suffice, 425 U.S. at 693-95, 96 S.Ct. at 1860-1861. However, in Underhill, Reporters' Note 2, as well as in Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), and Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918), informal actions by military commanders whose authority was later ratified were held to constitute unreviewable acts of state. See also Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1533-36 (D.C.Cir.1984), vacated, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). In Filartiga v. Pena-Irala, 630 F.2d 876, 889 (2d Cir. 1980), § 703, Reporters' Note 7, the court said: "We doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that Nation's government, could properly be characterized as an act of state." Compare Von Dardel v. U.S.S.R., 623 F.Supp. 246 (D.D.C.1985) (act of state doctrine apparently deemed inapplicable in suit for injury in U.S.S.R. to Swedish diplomat Wallenberg); de Letelier v. Republic of Chile, 488 F.Supp. 665 (D.D.C.1980) (act of state doctrine held inapplicable because act designed to cause injury to persons in the United States). See Reporters' Note 4.

    In an action brought by the Republic of the Philippines against its former President, seeking to recover assets alleged to have been acquired in violation of Philippine law, the Court of Appeals for the Second Circuit held that the act of state doctrine applies only to governmental acts of a foreign state; it does not preclude examination of private acts of a foreign head of state. The court also declared that the burden of establishing that the act of state doctrine applies is on defendants, and suggested that the act of state doctrine might not apply to acts of a government no longer in power, especially when the government now in power is seeking the adjudication by United States courts. See Republic of the Philippines v. Marcos, 806 F.2d 344 (2d Cir.1986). Contra: Republic of the Philippines v. Marcos, 818 F.2d 1473 (9th Cir.1987).

    4. *Territorial limits of act of state doctrine.* The act of state doctrine does not extend to takings of property located outside of the territory of the acting state at the time of the taking, even if the property belonged to an enterprise based in that state. See Sabbatino, Reporters' Note 2, at 413-19. In Republic of Iraq v. First National City Bank, 241 F.Supp. 567 (S.D. N.Y.1965), affirmed, 353 F.2d 47 (2d Cir.1965), certiorari denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), the government of Iraq issued an ordinance confiscating all of the property of the former king, including assets held at a New York bank. When the bank refused to turn over the assets, the new government brought suit, but did not prevail. The court of appeals said: "[W]hen property confiscated is within the United States at the time of attempted confiscation, our courts will give effect to acts of state only if they are

Copr. © 2007 The American Law Institute.

consistent with the policy and law of the United States.'" 353 F.2d at 51. However, the courts may give effect to an act of state even as to assets in the United States, where it serves the policy aims of the United States to do so. United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); Banco Nacional de Cuba v. Chemical Bank New York Trust Co., 658 F.2d 903 (2d Cir. 1981).

For purposes of the act of state doctrine, a suit by a foreign government in United States courts to recover property located in the United States which had been illegally taken by a former head of state is not an attempt by a foreign government to seize property outside its territory. See Republic of the Philippines v. Marcos, Reporters' Note 3.

In Compania Ron Bacardi, S.A. v. Bank of Nova Scotia, 193 F.Supp. 814 (S.D.N.Y.1961), decided before Sabbatino, the shareholders of a Cuban company which had been expropriated by the government of Cuba were held to be entitled to hold a directors' meeting in the United States and to vote shares in the company in order to bring suit to obtain control of assets held outside of Cuba. Trademarks, in particular, have been held to be strictly territorial in the state of registry, so that former owners of marks registered in the United States could claim rights to them against those claiming under an act of a foreign state. Zwack v. Kraus Bros. & Co., 237 F.2d 255 (2d Cir. 1956); F. Palicio v Compania, S.A. v. Brush, 256 F.Supp. 481, 490-93 (S.D.N.Y.1966), affirmed, 375 F.2d 1011 (2d Cir.), certiorari denied, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967) (an earlier phase of the Dunhill litigation not affected by the appeal); Maltina Corporation v. Cawy Bottling Co., 462 F.2d 1021 (5th Cir.), certiorari denied, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972).

It appears from the Dunhill case that the accounts receivable at issue in the case were deemed to be located for this purpose at the place of business of the debtor. See Lowenfeld, "In Search of the Intangible: A Comment on Shaffer v. Heitner," 53 N.Y.U. L.Rev. 102, 114 (1978). Compare, however, Allied Bank International v. Banco Creditor Agricola de Cartago, 757 F.2d 516 (2d Cir.), certiorari dismissed, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed. 2d 706 (1985), where the court held that an obligation based on a loan was located at the place of payment chosen by parties to the loan agreement, with Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 862 (2d Cir.1981), certiorari denied, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), not decided on act of state grounds, in which the court held the home office of a United States bank liable for deposits made in its Vietnam branch, when closure of that branch occurred prior to the confiscatory act. United States courts have divided on whether obligations under life insurance policies issued in Cuba by companies established outside of Cuba are to be considered within Cuban territory for purposes of the act of state doctrine. Compare Pan-American Life Insurance Co. v. Blanco, 362 F.2d 167 (5th Cir.1966), and Varas v. Crown Life Insurance Co., 204 Pa.Super. 176, 203 A.2d 505 (1964), certiorari denied, 382 U.S. 827, 86 S.Ct. 62, 15 L.Ed.2d 72 (1965), with Present v. United States Life Insurance Co., 96 N.J. Super. 285, 232 A.2d 863 (1967), affirmed, 51 N.J. 407, 241 A.2d 237 (1968), and Fernandez v. Pan-American Life Insurance Co., 281 So.2d 779 (La.App.1973).

Two almost simultaneous decisions by federal and State courts have reached opposite results in cases involving certificates of deposit issues in Cuba by the branch of a bank with headquarters in the United States. Compare Garcia v. Chase Manhattan Bank, N.A., 735 F.2d 645 (2d Cir.1984) (act of state doctrine not applied in view of promise to pay at any branch worldwide), with Perez v. Chase Manhattan Bank, N.A., 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5, certiorari denied, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984) (act of state doctrine applied on basis that debt could have been enforced or collected in Cuba). See also Braka v. Bancomer, Reporters' Note 6, in which recovery from the New York branch of a Mexican bank on a certificate of deposit issued at the bank's home office was barred on the basis of the act of state doctrine. The prevailing United States view appears to be that when a loan is expressly made payable and enforceable in a place outside of the debtor's domicile, the debt is situated at the place chosen. The act of state doctrine would not be applied to preclude review of a prohibition against payment by the state of the debtor's domicile. See Weston Banking Corp. v. Turkiye Garanti Bankasi, A.S., 57 N.Y.2d 315, 456 N.Y.S.2d 684, 442 N.E.2d 1195 (1982); Libra Bank, Ltd., v. Banco Nacional de Costa Rica, S.A., 570 F.Supp. 870 (S.D.N.Y.1983); Allied Bank International v. Banco Credito Agricola de Cartago, 757 F.2d 516 (2d Cir.), certiorari dismissed, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985), discussed in § 822, Reporters' Note 6. In principle, it might be preferable to approach the applicability of the act of state doctrine to intangible assets not by searching for an imaginary situs for property that has no real situs, but by determining how the act of the foreign state in the particular circumstances fits within the reasons for the act of state doctrine and for the territorial limitation, Comments a, b. See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1123-25 (5th Cir. 1985).

Copr. © 2007 The American Law Institute.

In Tchacosh Co., Ltd. v. Rockwell International Corp., 766 F.2d 1333 (9th Cir.1985), the court held that an expropriation of the management authority of an Iranian Company by the Revolutionary Government of Iran came within the act of state doctrine; the court therefore dismissed a suit on behalf of the expropriated company for payment for work performed for the defendant in Iran, rejecting the argument that the underlying claim was within the territorial exception to the act of state doctrine because the headquarters of the defendant company were in the United States and the contract debt therefore was situated in the United States.

See generally, Note, "The Act of State Doctrine: Resolving Debt Situs Confusion," 86 Colum.L.Rev. 594 (1986). For emphasis on territoriality in analogous contexts, see § 402, Comment c, and § 441, Comment b.

5. *"Treaty or other unambiguous agreement."* One of the issues left open in Sabbatino, Comment b, concerns review by United States courts of alleged lack of compliance by a foreign state in its own territory with a treaty or other unambiguous agreement. In Kalamazoo Spice Extraction Co. v. Government of Socialist Ethiopia, the state-controlled successor to an Ethiopian company, that had been 80 percent owned by a United States company brought suit in a United States district court for nonpayment of invoices for goods sold, and the United States company counterclaimed for expropriation of its controlling interest in the Ethiopian company. The lower court dismissed the counterclaim on the basis of the act of state doctrine, notwithstanding the existence of a Treaty of Friendship, Commerce and Navigation (Treaty of Amity) between the United States and Ethiopia, on the ground that the relevant provisions of that treaty did not constitute an "unambiguous agreement." 543 F.Supp. 1224 (W.D.Mich.1982). The Court of Appeals for the Sixth Circuit reversed, 729 F.2d 422 (6th Cir.1984), holding that the standard clause of the FCN treaty stating that property of nationals of the contracting parties in the other state shall not be taken "without prompt payment of just and effective compensation" provided a "controlling legal standard in the area of international law," and that therefore the act of state doctrine did not apply. 729 F.2d at 425, 427. The court pointed out that the Executive Branch had appeared as amicus curiae in Kalamazoo Spice, urging reversal, thus removing the concern expressed in Sabbatino that adjudication of the claim might interfere with the conduct of foreign affairs by the Executive Branch. The court remanded the case to the district court to review the actions of the government of Ethiopia, including a tender of compensation at book value, in light of the treaty standard. Thereafter, the case was settled as part of a lump-sum agreement between the United States and Ethiopia, 25 Int'l Leg. Mat. 56, 62 (1986).

In Callejo v. Bancomer, S.A., 764 F.2d 1101, 1116-21 (5th Cir.1985), the court of appeals discussed the treaty exception to the act of state doctrine at length in the context of an assertion that Mexico's exchange controls on dollar deposits in Mexican banks violated the Articles of Agreement of the IMF. The court noted that Sabbatino elaborated a treaty exception, but found it significant that the Supreme Court articulated that exception "in negative rather than positive terms . . . but did not state the converse, namely, that if a treaty exists then the act of state doctrine does not apply." Application of the exception "depends on pragmatic considerations, including both the clarity of the relevant principles of international law and the potential implications of a decision on our foreign policy." Id. at 1117-18. The court held "that the treaty exception does not render the act of state doctrine inapplicable" to the claims in issue. Id. at 1121. See also Ramirez de Arellano v. Weinberger, Reporters' Note 3; American International Group, Inc. v. Islamic Republic of Iran, 493 F.Supp. 522, 525 (D.D.C.1980), vacated on other grounds, 657 F.2d 430 (D.C.Cir. 1981).

6. *Act of state doctrine and commercial transactions.* Four members of the majority in Dunhill, Reporters' Note 2, set forth two justifications for a commercial exception to the act of state doctrine: (1) an analogy, controverted by the four dissenters, to the commercial activity exception to the doctrine of sovereign immunity (See § 453); and (2) the fact that in commercial dealings, as contrasted with matters such as expropriation, there is a broad international consensus as to the applicable rules of law, 425 U.S. at 695- 706, 96 S.Ct. at 1861-1866, so that a decision against the validity of the foreign act would be unlikely to "touch sharply on the nerves" of members of the international community. Cf. Sabbatino, 376 U.S. at 428, 84 S.Ct. at 940; Dunhill, 425 U.S. at 704, 96 S.Ct. at 1866. For instance, if state X cancels a long-term supply contract with a seller in the United States on the ground that the seller had supplied defective merchandise, a decision by a court in the United States in favor of the seller would probably not violate internationally shared expectations; in contrast, termination of the same contract because X had broken relations with the United States or had banned all "capitalist enterprises" might well involve the kind of issue not appropriate for decision by the judiciary. A restriction by the government of Mexico on withdrawal of dollar deposits placed in Mexican banks in Mexico was held to be subject to the act of state doctrine. Braka v. Bancomer, 589 F.Supp. 1465 (S.D. N.Y.1984), affirmed, 762 F.2d 222 (2d Cir.1985). If, however, the foreign state has

Copr. © 2007 The American Law Institute.

expressly subjected disputes concerning particular kinds of obligations to international scrutiny, the decision on whether the act of state doctrine should be applied might come out differently. See Comment e.

   7. *Act of state doctrine in antitrust and other non-expropriation cases.* In a series of private actions in which plaintiffs accused defendants of depriving them of valuable rights granted by a foreign government, defendants sought to rely on the act of state doctrine to foreclose scrutiny of their conduct. When the causal chain between defendant's alleged conduct and plaintiff's injury could not be determined without an inquiry into the motives of the foreign government, the defense was successful and the cause of action dismissed. Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92 (C.D.Cal.1971), affirmed, 461 F.2d 1261 (9th Cir.), certiorari denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972); Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir.), certiorari denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum, 577 F.2d 1196 (5th Cir.1978), certiorari denied, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979); Clayco Petroleum Corp. v. Occidental Petroleum Corp., 712 F.2d 404 (9th Cir.1983), certiorari denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). When defendant's conduct could be judged without scrutiny of the acts or motives of the foreign government, the act of state doctrine has not been applied. Timberlane Lumber Co. v. Bank of America National Trust & Savings Assoc., 549 F.2d 597 (9th Cir.1976); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287 (3d Cir.1979); Industrial Investment Development Corp. v. Mitsui & Co., 594 F.2d 48 (5th Cir.1979), certiorari denied, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). In Timberlane, § 415, Reporters' Note 4, plaintiffs accused defendants of conspiring to deprive them of the opportunity of engaging in the business of cutting, milling, and exporting lumber in Honduras. Defendants argued that such injuries as plaintiffs suffered resulted from acts of the government of Honduras, and that the claims were therefore barred by the act of state doctrine. The court of appeals, reversing the district court, said: "Even if the coup de grace to [plaintiffs'] enterprise in Honduras was applied by official authorities, we do not agree that the doctrine necessarily shelters these defendants or requires dismissal of the . . . action." 549 F.2d at 605. If the defendants' conduct had been compelled by the government of Honduras, they could have asserted the defense of foreign government compulsion (§ 441); since there was no such assertion, no effort to name the government of Honduras or any of its officials as defendants or co-conspirators, and no assertion that the government had exercised jurisdiction to give effect to its public interests, the act of state doctrine was not applicable. See also Ramirez de Arellano v. Weinberger, Reporters' Note 3. For an effort by courts to separate claims that do from claims that do not require intrusion into the policies of foreign states in connection with a libel action, see DeRoburt v. Gannett Co., 733 F.2d 701 (9th Cir.1984), certiorari denied, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985); see also Sharon v. Time, Inc., 599 F.Supp. 538, 543-47 (S.D.N.Y.1984), in which the court found the act of state doctrine inapplicable to warrant dismissing a libel action by an official of a foreign state, since the alleged acts that were the basis of the claimed libel were not acts of the government, and the litigation did not involve a challenge to the validity of any act of a state or necessarily include inquiry into activities of the state. See also Republic of the Philippines v. Marcos, Reporters' Note 3.

   In International Association of Machinists and Aerospace Workers (IAM) v. Organization of Petroleum Exporting Countries (OPEC), 649 F.2d 1354 (9th Cir.1981), certiorari denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982), the court of appeals held that a challenge to OPEC's price fixing activity raised an act of state considerations, since "OPEC and its activities are carefully considered in the formulation of American foreign policy," and since any relief granted to plaintiffs "would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." 649 F.2d at 1361. Whether the price fixing activity would come within the territorial limitations of the act of state doctrine, Reporters' Note 4, was not discussed by the court.

   8. *The "Bernstein" exception.* The term "Bernstein letter" derives from litigation involving a series of claims brought after World War II by Arnold Bernstein, a Jew residing in the United States who had formerly resided in Germany, to recover property taken from him under duress by the Nazi government of Germany. The Court of Appeals for the Second Circuit at first declined to consider Bernstein's claims on the ground of the act of state doctrine, pointing out that the Executive Branch had given no indication of "positive intent to relax the doctrine." Bernstein v. Van Heyghen Frères, S.A., 163 F.2d 246, 251 (2d Cir.), certiorari denied, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 173 F.2d 71 (2d Cir.1949). Subsequently, the State Department wrote a letter declaring the "policy of the Executive . . . to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials." Thereafter, the court of appeals changed its decision in the second case and directed the trial court to make a full inquiry into the allegations of the plaintiff. 210 F.2d 375 (2d Cir.1954). See 6 Whiteman, Digest of

Copr. © 2007 The American Law Institute.

International Law 13-20 (1968).

In Sabbatino, the Court indicated that it was not inclined toward having applicability of the act of state doctrine depend on the wishes of the Executive Branch. 376 U.S. at 420, 436, 84 S.Ct. at 936, 944. In First National City Bank, Reporters' Note 2, the State Department's Legal Adviser wrote a "Bernstein letter," and three members of the Court relied on that letter as the rationale for their decision sustaining a counterclaim for set-off based on expropriation of property in Cuba. The other six Justices, including the two who concurred in the result and the four dissenters, rejected the Bernstein exception. In Dunhill, the State Department again wrote a Bernstein letter, but it was not decisive to the outcome.

In the Kalamazoo Spice case, Reporters' Note 5, the Legal Adviser of the State Department also wrote a Bernstein letter, stating that the Executive Branch did not object to adjudication of the particular controversy, and, further, that in the Department's view when there is a controlling legal standard for compensation in expropriation cases, as in a case governed by an FCN treaty, there should be a general presumption that adjudication would not be inconsistent with the foreign policy interests of the United States, unless in a particular case the Executive Branch acted to indicate otherwise.

It seems that if the State Department issues a letter requesting that the courts not review the validity of a particular act, such a letter will be highly persuasive if not binding. See also § 444 and Comment f thereto. If the State Department issues a letter stating that it has no objection on foreign relations grounds to adjudication of the validity of a given act of a foreign state, courts in the United States will make their own determination as to whether to apply the act of state doctrine, taking the view of the Executive Branch into account but not being bound by it.

9. *Counterclaims and related parties.* The Supreme Court held in First National City Bank, Reporters' Note 2, that the act of state doctrine does not preclude a counterclaim where (i) the Executive Branch has provided a "Bernstein letter," Reporters' Note 8; (ii) there is no showing that adjudication of the claim will interfere with delicate foreign relations; and (iii) the counterclaim is asserted by way of set-off, not exceeding the value of plaintiff's claim. See also Banco Nacional de Cuba v. Chase Manhattan Bank, 658 F.2d 875, 884 (2d Cir. 1981). If one of these factors is absent, it appears that the act of state doctrine applies to counterclaims as well as to initial claims, even if the defendant on the principal claim seeks only a set-off. Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co., 652 F.2d 231 (2d Cir. 1981).

The act of state doctrine was at issue in a number of cases stemming from the rupture between the United States and Cuba, involving claims by one Cuban entity and counterclaims for set-off against another entity or against the state itself arising out of "intervention" or expropriation. The Supreme Court has held that the issue of responsibility of related state agencies is controlled by principles "common to both international law and federal common law." Normally, the courts will respect the separate personality of instrumentalities "established as juridical entities distinct and independent" from the sovereign. But this presumption may be overcome where one party "is so extensively controlled by its owner that a relationship of principal and agent is created," or where adherence to the corporate form "would work fraud or injustice." First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 629-30, 103 S.Ct. 2591, 2601-2602, 77 L.Ed.2d 46 (1983). See also Banco Nacional de Cuba v. First National City Bank, 478 F.2d 191, 193 (2d Cir.1973, on remand from Sup.Ct.); Banco Nacional de Cuba v. Chase Manhattan Bank, 658 F.2d 875, 885-87 (2d Cir.1981); and § 452, Reporters' Note 2.

10. Act of state doctrine and nonrecognition of foreign public judgments. The doctrine requiring courts to give effect to foreign acts of state may be contrasted with the unwillingness of courts to give effect to foreign public law judgments. In general, efforts by foreign states to secure recognition of judgments involving penal, fiscal, or other public law matters have been unsuccessful, though international law does not forbid such recognition. See § 483. The reluctance of courts to recognize these foreign judgments lies principally in unwillingness to accept such judgments without full scrutiny, and at the same time unwillingness to subject such actions of foreign states to scrutiny. In the latter respect, the practice concerning foreign public law judgments and the act of state doctrine have similar roots. However, whereas under the public judgments doctrine, reluctance to scrutinize generally results in non-recognition of a foreign judgment, under the act of state doctrine reluctance to scrutinize ordinarily results in giving effect to a foreign act. While the distinction between a foreign judgment and a foreign act of state is not always easy to draw, in general the public judgments doctrine is directed to judicial decisions, whereas the act of state doctrine is directed to acts of general application decided by the executive or legislative branches of the acting

Copr. © 2007 The American Law Institute.

state, even if confirmed or applied by courts in that state.

11. Act of state doctrine and sovereign immunity contrasted. Both the act of state doctrine and sovereign immunity are based on considerations of respect for the sovereign independence and equality of states, and on perceived limitations on the authority of domestic courts of one state to judge the activities of another state. The relaxation in recent years of the doctrine of sovereign immunity (see Introductory Note to Chapter 5, Subchapter A) has resulted in subjecting certain activities of foreign states to judicial scrutiny, but (with some exceptions) these are activities carried out in or related to the state of the forum. The act of state doctrine, in contrast, concerns judicial scrutiny of activities of foreign states in their own territories. Furthermore, the doctrine of sovereign immunity is addressed essentially to the jurisdiction of courts; the act of state doctrine is addressed to the permissible scope of inquiry by courts into particular issues presented. See Comment *a*. As noted in § 455, Comment *c*, sovereign immunity and act of state may be raised in the same case and in some instances with respect to the same issue. Jurisdiction, including any defense of immunity, should be decided first; a determination that the defendant state is not entitled to immunity is not dispositive of applicability of the act of state doctrine.

12. Act of state doctrine in foreign law. As the Supreme Court stated in Sabbatino, no rule of international law requires application of the act of state doctrine. Nevertheless, the courts of most states have exercised judicial restraint in adjudicating challenges to expropriations by foreign states, whether by application of the act of state doctrine, A.M. Luther v. James Sagor & Co. (U.K.), [1921] 3 K.B. 532 (C.A.); by narrow construction of the responsibility of states to alien investors, Anglo-Iranian Oil Co. Ltd. v. S.U.P.O.R. Co. (Italy), [1955] Int'l L.Rep. 23 (Civil Ct. Rome, Sept. 13, 1954); or by application of local public policy (ordre public) to oust normal rules of conflict of laws, Reporters' Note 1, in actions by local plaintiffs only. Soc. Minera El Teniente, S.A. v. A.G. Norddeutsche Affinerie (German Fed. Republic), 12 Int'l Leg.Mat. 251 (Hamburg, Landgericht Jan. 22, 1973). Contra: Anglo-Iranian Oil Co., Ltd. v. Jaffrate, [1953] 1 W.L.R. 246, [1953] Int'l L.Rep. 316 (Aden Sup.Ct.); Senembah Maatschappij N.V. v. Republiek Indonesie Bank Indonesia, Ned. Jurisprudentsie 1959, No. 73, p. 218 (Amsterdam Ct.App.). For a survey of cases to 1965, see Reeves, "The Act of State--Foreign Decisions cited in the Sabbatino Case: A Rebuttal and Memorandum of Law," 33 Fordham L.Rev. 599, 618-70 (1965). After many years of uncertainty, see Singer, "The Act of State Doctrine of the United Kingdom: An Analysis with Comparison to United States Practice," 75 Am.J. Int'l L. 283 (1981), the House of Lords decided in 1981 to adopt the United States view of the act of state doctrine, on the basis of a shared view of the nature and limits of the judicial function. Buttes Gas & Oil Co. v. Hammer, [1982] A.C. 888, 936-38 (H.L.(E.)). In Williams & Humbert, Ltd. v. W. H. Trademarks (Jersey) Ltd., [1986] 2 W.L.R. 24 (H.L.(E.)), the House of Lords reaffirmed that "an English court will recognize the compulsory acquisition law of a foreign state and will recognize the change of title to property which has come under the control of the foreign state and . . . the consequences of that change of title. The English court will decline to consider the merits of compulsory acquisition . . . [or to entertain an attack on the motives of the friendly foreign state]."

13. Previous Restatement. The previous Restatement dealt with the act of state doctrine in §§ 41-43. This Restatement takes account of later developments.

Research References

1. Digest System Key Numbers

International Law ⟫ 10.8.

2. A.L.R. ANnotation

Situs of debt or property for purposes of act of state doctrine. 77 ALR Fed 293.

Modern status of the Act of Stat Doctrine. 12 ALR Fed 707.

Case Citations

Case Citations through June 2006

Copr. © 2007 The American Law Institute.

<u>**Case Citations through June 2006:**</u>

**C.A.2,** 1985. Com. (c) cit. but dist. (citing § 428, T.D. No. 4, 1983, which is now § 443). The defendant, a state-owned Costa Rican bank, was in default of promissory notes because of the foreign sovereign's actions. The foreign agency refused to authorize external debt payments in United States currency, which precluded the payment of the note. The district court dismissed the plaintiff's action based on the act-of-state doctrine, which precluded judicial examination. This court reversed. Noting that this judicially created doctrine was not jurisdictional and that its application depended on its likely impact on international relations, the court held that the act-of-state doctrine did not apply, since the United States was the situs of the debt at the time of the taking. Allied Bank Intern. v. Banco Credito Agricola, 757 F.2d 516, 520, certiorari dismissed 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

**C.A.2,** 1986. Quot. in disc. (citing § 428, T.D.No.4, 1983, which is now § 443); quot. in disc., com. (e) cit. but dist. (citing § 469, T.D.No. 7, 1986, which is now § 443); com. (b) cit. in sup. (citing § 469, T. Final D., 1985, which is now § 443). The Republic of the Philippines sought a preliminary injunction to prevent its former head of state from transferring or encumbering certain property in New York that was allegedly purchased with funds stolen from the Republic. The trial court granted the preliminary injunction. Affirming, this court held that there was federal jurisdiction, since an action brought by a foreign government against its former head of state arises under federal common law because of the necessary implications of such an action for United States foreign relations. The court further held that the Republic had presented enough evidence of illegality to warrant a preliminary injunction based on a claim for imposition of a constructive trust or an equitable lien, and that the defendant's defenses based on sovereign immunity and the act of state doctrine were without merit. Republic of Philippines v. Marcos, 806 F.2d 344, 353, 358, 359, cert. dismissed 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987).

**C.A.2,** 1988. Com. (b) cit. in sup. A Nicaraguan steel company failed to take possession of material from a United States supplier before a newly established government officially seized the company's assets. Former majority shareholders and the Nicaraguan representative sued the United States supplier to recover the purchase price. The district court ordered a pro rata payment to the shareholders on the ground that the act of state doctrine did not bar United States judicial intervention. Affirming in part and reversing in part, this court held, inter alia, that the official intervention decree of the Nicaraguan government contravened United States policy and had no effect on property in the United States; therefore it was appropriate for the district court to look to this country's laws to determine the reach of the foreign sovereign's proscriptions. The court reasoned that the "taking" of the plaintiffs' property within the United States pursuant to the intervention decree, and the defendant's failure to provide just compensation were actions inconsistent with United States policy; therefore the decree need not be enforced by this court. Bandes v. Harlow & Jones, Inc., 852 F.2d 661, 667.

**C.A.2,** 1989. Com. (i) quot. in ftn. in sup. An American citizen was expelled from Switzerland by an order of a Swiss court, and Swiss police forcibly put her on a Swissair airplane bound for the United States. The woman sued Swissair for damages caused by the airline's cooperation in her forcible removal. The district court dismissed the complaint on the ground that the act of state doctrine precluded United States courts from inquiring into the validity of public acts committed by a foreign power. Reversing and remanding the case for trial, this court held that such facts as the immediacy of the plaintiff's expulsion, use of force in putting her on the plane, and the refusal to send the plaintiff to a country of her choice created doubt whether the Swiss court order was performed in a manner prescribed by Swiss law. If it were not, the court said the act of state defense was not available, although the defendant could raise other tort law defenses. Galu v. Swissair: Swiss Air Transport Co., Ltd., 873 F.2d 650, 654, on remand 734 F.Supp. 129 (S.D.N.Y.1990), decision affirmed 923 F.2d 842 (2d Cir.1990).

**C.A.2,** 1993. Quot. in disc. Victims of a gas leak disaster at a Bhopal, India, chemical plant brought class actions against the plant's owner in Texas state court. On removal and transfer, the district court dismissed on the ground of forum non conveniens. Affirming, this court held that plaintiffs lacked standing to challenge the Indian government's negotiated settlement with defendant of the disaster victims' claims pursuant to an Indian statute granting the Indian government exclusive standing to represent the victims. The court noted that, under the act of state doctrine, it would not sit in judgment on acts of a governmental character done by a foreign state within its own territory and applicable there. Bi v. Union Carbide Chemicals and Plastics Co. Inc., 984 F.2d 582, 586, cert. denied 510 U.S. 862, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993).

**C.A.3,** 1988. Cit. in disc., com. (a) cit. in ftn. (citing § 469, T.D. No. 6, 1985, which is now § 443 of the

Copr. © 2007 The American Law Institute.

REST 3d FOREL § 443                                                                                     Page 12
Restatement (Third) of Foreign Relations Law § 443 (1987)

Official Draft). A company obtained a contract with a foreign government for the sale of aeromedical equipment after it paid off several of the foreign government's officials. A competitor, which had submitted a lower bid, sued the company for damages on racketeering charges, alleging that the company bribed the foreign government to obtain the contract in violation of federal and state laws. The district court granted the defendant summary judgment on the ground that the act of state doctrine barred the adjudication of the plaintiff's claim. Affirming in part, reversing in part, and remanding, this court held, inter alia, that the act of state doctrine did not bar the adjudication of the claim. The court stated that, because the case did not involve a judicial determination of the foreign state's acts with regard to matters within its own borders but involved merely the determination of the motivations of the public acts of the foreign state's officials, the traditional justification for involving the act of state doctrine was not present in this case. Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1058, judgment affirmed 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

C.A.4, 1990. Cit. in disc. On the eve of his deportation, an illegal alien from El Salvador moved to reopen his deportation proceedings so that he could request asylum under the Refugee Act of 1980. An immigration judge denied the motion on the ground that the petitioner failed to present a prima facie case of eligibility for asylum, and the Board of Immigration Appeals affirmed. Affirming, this court held that the Board did not abuse its discretion in holding that the petitioner failed to establish a prima facie case of a "well-founded fear of persecution" needed to warrant reopening, because he did not show that a reasonable person in his circumstances would have feared persecution if he were returned to El Salvador. The court said that the federal courts lacked the expertise and the constitutional authority of ruling, as a matter of law, that a government whose actions had not been condemned by international governmental bodies engaged in persecution against its citizens. M.A. v. U.S. I.N.S., 899 F.2d 304, 314.

C.A.5, 1985. Com. (b) and Rptr's Notes 4 and 12 cit. in ftn. (T.D. No. 6, 1985). In compliance with Mexican government regulations that mandated that all deposits be repaid in Mexican currency, a bank notified depositors that it would pay the principal and interest on their certificates of deposit in pesos at a rate well below the market rate. The plaintiffs, who were depositors, sued the bank for breach of contract, when the private bank became nationalized. The trial court dismissed the case on the ground that the bank, as an instrumentality of the Mexican government, was immune from suit under the Foreign Sovereign Immunities Act (FSIA). This court held that the trial court had erred on this point and granted a statutory exception to FSIA on the ground that the bank's activity was commercial activity carried on outside the United States that had direct effects in the United States. The court analyzed the case under the act of state doctrine, holding that a United States court must defer to the sovereign act of Mexico by which the government mandated that Mexican bank deposits be repaid in Mexican currency. The court noted that, although the act of state doctrine is not prescribed by international law, most nations have shown solicitude for the laws of fellow states. The court concluded that the issue should be characterized as a "political question" to be handled through diplomatic channels. Callejo v. Bancomer, S.A., 764 F.2d 1101, 1111, 1114, 1117, 1124.

C.A.5, 1985. Rptr's Note 11 cit. in disc. (citing § 469, T.D. No. 6, 1985, which is now § 443). A payee sued to collect on a check issued her by a Nicaraguan bank shortly before the Nicaraguan government fell to the Sandinista revolutionaries. The payee could not cash the check after the new government took office and stopped payment on it. Originally, the trial court denied the bank's motion to dismiss, finding that there was jurisdiction pursuant to the Foreign Sovereign Immunities Act and that the act of state doctrine did not apply. After discovery, the trial court reversed itself on the act of state issue and granted the bank's motion to dismiss. Affirming, this court held that the bank was immune from suit under the doctrine of sovereign immunity. The court reasoned that sovereign immunity was jurisdictional in nature and had to be considered before the act of state doctrine could be reached. De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1389.

C.A.7, 1989. Cit. in disc. An Iranian engineering consulting corporation and one of its former shareholders sued to collect a debt that the defendant allegedly owed the plaintiffs for consulting work done for the defendant in Iran before the Iranian revolution. The defendant was a Delaware corporation with its principal place of business in Chicago. The district court granted the defendant summary judgment on the ground that the act of state doctrine barred the suit. Affirming, this court held that the debt allegedly owed by the defendant could not be considered an asset of the plaintiffs for purposes of the extraterritorial exception to the act of state doctrine. The court said the American corporation's debt, the plaintiffs' asset, was located in Iran and was therefore subject to the concerns manifested in the act of state doctrine. F. & H.R. Farman-Farmaian Cons. Eng. v. Harza Eng., 882 F.2d 281, 286,

Copr. © 2007 The American Law Institute.

cert. denied <u>497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 809 (1990)</u>.

**C.A.9,** 1987. Rptr's Note 7 quot. in sup. (citing § 469, T.D.No. 7, 1986, which is now § 443). Investors sued state-owned foreign banks for violations of federal securities laws. The trial court granted summary judgment for the banks. Affirming, this court held that the investors could not prevail on the securities claim where the causal chain between the banks' alleged conduct and the investors' injury could not be determined without an inquiry into the motives of the foreign government, an inquiry barred by the act of state doctrine. <u>West v. Multibanco Comermex, S.A., 807 F.2d 820, 828,</u> cert. denied <u>482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987),</u> rehearing denied <u>483 U.S. 1040, 108 S.Ct. 10, 97 L.Ed.2d 800 (1987)</u>.

**C.A.9,** 1992. Subsec. (1) and com. (b) cit. in ftn. An Argentine man who was threatened and tortured by a military junta gathered his family, sold their land, arranged for someone to oversee the family business, and fled to America to live with their daughter, a United States citizen. The junta then seized the family business, altered property records, and sought the assistance of United States courts to prosecute the man. Family later sued the Argentine government, inter alia, for expropriation of their property, among other claims. California federal district court dismissed the torture claims and dismissed the expropriation claims sua sponte on the basis of the act of state doctrine. Reversing and remanding, this court held, in part, that district court erred in deciding the act of state issue without first considering the threshold issue of its subject matter jurisdiction under the Foreign Sovereign Immunities Act. If, on remand, district court decided that it had jurisdiction, it could consider the act of state doctrine defense. <u>Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 707,</u> cert. denied <u>507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993)</u>.

**C.A.9,** 2001. Com. (i) quot. in part in ftn. Latin American banana workers brought a class action in state court against multinational fruit and chemical companies that allegedly exposed the workers to a toxic pesticide. After defendants removed the case to federal court, the district court denied plaintiffs' remand motion, and dismissed the case for forum non conveniens. Reversing and remanding with instructions that the case be remanded to state court, this court held that federal-question jurisdiction did not exist under the act-of-state doctrine, because nothing in plaintiffs' complaint turned on the validity of any act of a foreign state. Moreover, the fact that the case concerned a vital sector of the economies of foreign countries and so had foreign-relations implications was not sufficient to confer federal-question jurisdiction. <u>Patrickson v. Dole Food Co., Inc., 251 F.3d 795, 800</u>.

**C.A.11,** 1991. Subsec. (1) quot. in disc. An American employee at a hospital in Saudi Arabia alleged that he was detained and tortured by agents of the Saudi government in retaliation for reporting safety hazards at the hospital to an investigative commission of the Saudi government. He sued Saudi Arabia and the hospital for his injuries, asserting subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA). The district court granted Saudi Arabia's motion to dismiss, holding that the plaintiff's claims were not based on the commercial activities of Saudi Arabia carried on in the United States as required by the FSIA. Reversing and remanding, this court held that there was subject matter jurisdiction under the FSIA. Noting that current governing authority limited the application of the closely related act of state doctrine, the court said that the recruitment and hiring of the plaintiff in the United States was a "commercial activity" of the Saudi government and that there was a nexus between this activity and the plaintiff's claims under the FSIA. <u>Nelson v. Saudi Arabia, 923 F.2d 1528, 1532,</u> vacated <u>996 F.2d 270 (11th Cir.1993)</u>.

**C.A.D.C.**1984. Com. (g) cit. in ftn. to diss. op., Rptr's Note 3 cit. in ftn. to diss. op. (citing § 428, T.D. No. 4, 1983, which is now § 443). A United States citizen sued the federal government, alleging that his privately owned ranch in Honduras was illegally occupied. The district court dismissed the case as a nonjusticiable issue. This court originally affirmed the lower court, but on an en banc rehearing it reversed and remanded. The court held that the citizen had standing to sue and that a resolution by the Honduran government to expropriate certain lands did not amount to a state action barring the citizen's complaint. The dissent argued that such actions did amount to a state action and that judicial notice may be given to the resolution of a foreign state. <u>Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1568, 1569,</u> certiorari granted and judgment vacated <u>471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985)</u>.

**C.A.D.C.**1986. Com. (a) quot. in ftn. (citing § 469, T.D.No. 7, 1986, which is now § 443). Protesters seeking to parade placards in front of foreign embassies sued the mayor of the District of Columbia asserting that a statute prohibiting such assembly without a permit was unconstitutional. The trial court granted summary judgment for the

Copr. © 2007 The American Law Institute.

defendant, ruling that the statute was necessary for the protection of the personnel and property of the foreign governments located in Washington, D.C. This court affirmed, upholding the constitutionality of the provision, and remanded for a determination of whether local authorities exceeded the scope of their statutory authority. The court reasoned that the statute was constitutional because it was based on a reluctance on the part of the government to offend, and a desire to avoid disrespect for foreign states. Finzer v. Barry, 798 F.2d 1450, 1456, judgment affirmed in part, reversed in part 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

C.A.D.C.1987. Quot. in sup., com. (e) cit. in disc. (citing § 469, T.D. No. 7, 1986, which is now § 443). A former Czechoslovakian citizen sued Czechoslovakia, alleging that he was entitled to compensation for the nationalization of certain textile production plants in Czechoslovakia that he had owned. Affirming the trial court's dismissal of the complaint, this court held that the defendant was immune from suit. The court also concluded that, even if the foreign sovereign immunity bar could be surmounted, the act of state doctrine precluded inquiry by a United States court into the validity of the alleged taking. Dayton v. Czechoslovak Socialists Republic, 834 F.2d 203, 206, 207, cert. denied 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921.

C.A.D.C.1999. Com. (a) cit. in disc. Taxpayer bank challenged decision of Commissioner of Internal Revenue disallowing tax credits taxpayer paid to the Brazilian government on income on loans it made to Brazilian bank. Commissioner disallowed the credits on the ground that taxpayer was not legally liable for the tax under the law of Brazil. The tax court entered judgment for Commissioner. Reversing and remanding, this court held that the "act of state" doctrine prevented the tax court from reexamining a decree entered by Brazil's Minister of Finance, in which he ordered Brazilian bank to pay the tax at issue on taxpayer's behalf. Riggs Nat. Corp. & Subsidiaries v. C.I.R., 163 F.3d 1363, 1367.

C.D.Cal.1989. Rptr's Note 8 cit. in ftn. An Iranian national bank sued an Iranian citizen, who was forced to leave the country when the Shah of Iran was ousted, for fraudulent conversion, alleging that the citizen had caused the bank to wrongfully transfer funds into his account. The defendant pleaded as an affirmative defense that any judgment obtained against him should be offset by the value of his property wrongfully confiscated by the Iranian government. The court granted the plaintiff's motion to strike the defendant's offset defense, reasoning that the act of state doctrine barred the defendant's offset defense, since adjudicating whether the government wrongfully confiscated the defendant's property would be to judge the legality of Iran's confiscation laws. The court noted that the "Berstein exception" to the act of state doctrine, whereby the court defers to the executive branch's advice that the doctrine need not apply in a particular situation, was rejected by a majority of the United States Supreme Court and therefore was not controlling here. Tejarat v. Varsho-Saz, 723 F.Supp. 516, 518.

C.D.Cal.2002. Com. (c) quot. in case quot. in disc. (citing § 428, com. 4, T.D. No. 4, 1983, which is § 443, com. (c), of the Official Draft). Current and former residents of one of the islands of Papua New Guinea brought a putative class action against members of an international mining group, alleging that defendants' mining operations destroyed the island's environment, harmed the health of its people, and incited a 10-year civil war. The court granted defendants' motions to dismiss on the basis of the political-question doctrine. The court also held, inter alia, that plaintiffs' claims for environmental tort and racial discrimination, but not for war crimes and crimes against humanity, were barred by the act-of-state doctrine. Sarei v. Rio Tinto PLC, 221 F.Supp.2d 1116, 1189.

N.D.Cal.2004. Rptr's Note 9 quot. in disc. Supporters of spiritual movement in China sued governmental officials of China, asserting claims under Alien Tort Claims Act (ATCA) and Torture Victims Protection Act (TVPA). This court granted in part and denied in part plaintiffs' motions for entry of default judgment, holding that plaintiffs established jurisdiction and were not statutorily barred under Foreign Sovereign Immunity Act from asserting claims against defendants under ATCA and TVPA, since defendants' acts were not validly authorized under Chinese law. The court held that act-of-state doctrine barred plaintiffs' claim for damages and injunctive relief but not their claim for declaratory relief. It recommended entry of default judgment declaring that certain plaintiffs were subjected to torture, cruel, inhuman, and degrading treatment, and arbitrary detention in violation of ATCA and TVPA. Doe v. Qi, 349 F.Supp.2d 1258, 1298.

S.D.Fla.1990. Rptr's Note 11 cit. in disc. General Manuel Noriega, the commander-in-chief of the Panamanian defense forces, and his personal secretary were charged with RICO violations and conspiracy to distribute and import cocaine into the United States. This court denied the defendants' motions to dismiss for lack of jurisdiction, holding, inter alia, that the act of state doctrine did not prohibit the court from adjudicating the legality of his official

Copr. © 2007 The American Law Institute.

actions in Panama. The court stated that Noriega's alleged drug trafficking and protection of money launderers did not constitute public action taken on behalf of the Panamanian state. U.S. v. Noriega, 746 F.Supp. 1506, 1521, affirmed 117 F.3d 1206 (11th Cir.1997).

S.D.Fla.1992. Subsec. (1) quot. in disc. A Florida company had entered into negotiations with the Republic of Honduras and its agents to purchase a government-owned cement company as part of privatization. After reaching what the company thought was an agreement, the Honduran government backed out of the deal. The Florida company sued the Republic of Honduras for breach of contract. This court denied defendant's motion for summary judgment, holding, inter alia, that the act of state doctrine presented no obstacle to jurisdiction in this case, since the underlying governmental action was unquestionably commercial in nature and adjudication would not interfere with any executive objective. AMPAC Group Inc. v. Republic of Honduras, 797 F.Supp. 973, 977.

S.D.Fla.1995. Subsec. (1) cit. in headnote and in disc. Honduran and Bahamian corporations that had contracted with the Government of Honduras to set up and maintain a comprehensive commercial aircraft registration database and system brought this action for breach of contract, inter alia, against the Government of Honduras and a Honduran official, after defendants invalidated the presidential decree ratifying the contract. The court denied defendants' motion to dismiss, holding, in part, that the act-of-state doctrine did not apply as a ground for dismissal because defendants' governmental action at the heart of plaintiffs' allegations was commercial in nature. Honduras Aircraft Registry v. Gov't of Honduras, 883 F.Supp. 685, 685, 687, affirmed in part, vacated in part 129 F.3d 543 (11th Cir.1997).

E.D.N.Y.2004. Subsec. (1) and Rptr's Note 4 cit. in sup. American film distributor sued Russian enterprises for copyright-infringement claiming an exclusive-copyright license, signed by the successor to the state-owned studio producer of the Russian films being licensed for worldwide distribution outside the former Soviet Union. The district court granted summary judgment for plaintiff. Defendants moved to vacate or modify judgment, based on Russian-court directives that purported to establish that the Russian government transferred the film copyrights to a Russian company, and not to the studio's successor. Denying the motion, this court held, inter alia, that the act-of-state doctrine was not applicable to the facts here; the situs of the exclusive copyright license was in the United States, not Russia, and application of the doctrine here would endanger the policy of independent judicial decision making. Films by Jove, Inc. v. Berov, 341 F.Supp.2d 199, 207, 211.

S.D.N.Y.1984. Cit. in disc., com. (4) quot. in disc. (citing § 428, T.D. No. 4, 1983, which is now § 443). The former defense minister of Israel filed a libel action after the defendant published a story about the massacre of Palestinian refugees in Israeli-occupied Lebanon. The story referred to the report of a special commission named by the Israeli government to investigate the massacre. The story alleged that the defense minister condoned the massacre of unarmed civilians. This court denied the defendant's motion for summary judgment, concluding that the defense minister should be permitted to defend himself against charges that he violated human rights. The Act of State doctrine would not prevent a United States court from examining an alleged human rights violation by another state, said the court, and the defense minister's claim that the defendant leveled such a charge against him with actual malice should be heard. Sharon v. Time, Inc., 599 F.Supp. 538, 552.

S.D.N.Y.1997. Cit. in disc. In case involving a series of international insurance, reinsurance, and retrocession transactions, Romanian retrocessionaire moved for summary judgment on the issue of its liability to American reinsured, arguing that a judgment entered by the Bucharest Court of District No. 3, which declared void ab initio all reinsurance contracts to which retrocessionaire was a party, was entitled to enforcement in the courts of the United States, and that retrocessionaire lacked the capacity to sue or be sued as of 1989, when the Socialist Republic of Romania was abolished and retrocessionaire dissolved by Executive Order. Denying retrocessionaire's motion, the court held that it was not obligated to enforce the Bucharest judgment under the doctrine of comity because there was no evidence that the Bucharest court ever had personal jurisdiction over reinsured or that the judgment, which was entered before Romania's democratization, was achieved under a system of jurisprudence likely to secure an impartial administration of justice. Similarly, retrocessionaire failed to show that the act-of-state doctrine required the court to recognize the Executive Order. Allstate v. Administratia Asigurarilor de Stat, 962 F.Supp. 420, 427.

S.D.N.Y.1997. Com. (i) quot. in disc. United States distributors of machine tools made in Germany sued, among others, a German government agency and a formerly state-owned enterprise responsible for all export and import transactions for East Germany's machine tool industry prior to reunification, seeking to recover for breach of

Copr. © 2007 The American Law Institute.

joint venture and commercial agency agreements. Denying in part defendants' motion for summary judgment, the court held, inter alia, that the "act of state" doctrine did not bar plaintiffs' claims, since defendants failed to show that adjudication of plaintiffs' claims would entail an inquiry into the validity of the sovereign acts of either the Federal Republic of Germany or the former German Democratic Republic. WMW Mach. Inc. v. Werkzeugmaschinenhandel, 960 F.Supp. 734, 745.

   **N.D.Ohio, 1996.** Cit. in headnote, com. (a) quot. in sup. Incarcerated taxpayer's sons brought wrongful levy action against federal government after government directed officials in the Netherlands to seize and sell the contents of sons' Dutch safe-deposit box in order to satisfy their father's tax debt. Government moved to dismiss, arguing, among other things, that the act-of-state doctrine precluded the imposition of liability. Denying the motion, the court held, inter alia, that the doctrine, which prevented judicial review of the acts of foreign sovereigns, was inapplicable where, as here, plaintiffs challenged the validity of actions taken by officials of the United States government. Miller v. U.S., 921 F.Supp. 494, 495, 499.

(1987)

 REST 3d FOREL § 443
 END OF DOCUMENT

Copr. © 2007 The American Law Institute.

# TAB 3

# California Practice Guide

## FEDERAL CIVIL PROCEDURE BEFORE TRIAL

Chapters 8-11

**William W Schwarzer**
Senior United States District Judge
Northern District of California
Former Director, Federal Judicial Center

**A. Wallace Tashima**
Senior United States Circuit Judge
U.S. Court of Appeals, Ninth Circuit

**James M. Wagstaffe**
Kerr & Wagstaffe
San Francisco, California

### CONTRIBUTING EDITORS

**Hon. Gerald E. Rosen**
U.S. District Judge,
Eastern District of Michigan

**Hon. Roslyn O. Silver**
U.S. District Judge,
District of Arizona

**Hon. Andrew J. Wistrich**
U.S. Magistrate Judge, Central District of California

**Atty. Steven J. Adamski**
San Luis Obispo, California

**Atty. Ivo Labar**
San Francisco, California

## 2007

CONTINUING LEGAL EDUCATION  PROGRAMS AND PUBLICATIONS

# THE RUTTER GROUP™
A DIVISION OF THOMSON WEST

[9:76 — 9:77.2]

motion first. This prevents a court without jurisdiction from prematurely dismissing a case with prejudice. (Dismissal for lack of subject matter jurisdiction is not a determination of the merits and does not prevent plaintiff from pursuing the claim in state court; *see ¶9:95.*) [*Ramming v. United States* (5th Cir. 2001) 281 F3d 158, 161]

a. **[9:76] Substantive bases:** The substantive bases for such a motion are discussed in *Ch. 2, Subject Matter Jurisdiction.*

**[9:76.1-76.4]** *Reserved.*

(1) **[9:76.5] Foreign sovereign immunity:** Defendants claiming immunity under the Foreign Sovereign Immunities Act (FSIA) do so through a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. [*Kirkham v. Societe Air France* (DC Cir. 2005) 429 F3d 288, 291]

b. **[9:77] Burden of proof on plaintiff:** Although defendant is usually the moving party on a Rule 12(b)(1) motion, plaintiff (except in cases removed from state court) is the party seeking to invoke the court's jurisdiction. Accordingly, plaintiff always bears the burden of establishing subject matter jurisdiction. In effect, the court presumes lack of jurisdiction until plaintiff proves otherwise. [*Kokkonen v. Guardian Life Ins. Co. of America* (1994) 511 US 375, 114 S.Ct. 1673, 1675; *Stock West, Inc. v. Confederated Tribes of the Colville Reservation* (9th Cir. 1989) 873 F2d 1221, 1225; *Crowley Marine Services, Inc. v. Fednav Ltd.* (ED WA 1995) 924 F.Supp. 1030, 1033 (citing text); *United States ex rel. Eitel v. Reagan* (D OR 1995) 898 F.Supp. 734, 737 (quoting text); *Valdez v. United States* (ED CA 1993) 837 F.Supp. 1065, 1067 (citing text), aff'd (9th Cir. 1995) 56 F3d 1177]

The nature of this burden varies depending on whether the motion is a facial or factual attack and, if the latter, whether the motion is determined on declarations and discovery alone or after an evidentiary hearing (*see ¶9:78*).

Compare: In response to a motion to remand under 28 USC §1447(c), defendant—the party who invoked federal jurisdiction—bears the burden of establishing federal jurisdiction; *see discussion at ¶2:1093.*

c. **[9:77.1] Who may bring Rule 12(b)(1) motion:** Since federal court jurisdiction cannot be conferred by stipulation or consent, either party is free to seek dismissal under Rule 12(b)(1); i.e., even the party who originally invoked federal jurisdiction may later seek to challenge it.

• **[9:77.2]** For example, a defendant who has removed the action to federal court may subsequently seek dismissal of the action on the basis of no subject matter

jurisdiction. [*Napoleon Hardwoods, Inc. v. Professionally Designed Benefits, Inc.* (7th Cir. 1993) 984 F2d 821, 822]

d. **[9:77.3]    May be raised by court sua sponte:**    Lack of subject matter jurisdiction may also be raised by the court sua sponte. [FRCP 12(h)(3); *see* ¶9:44]

e. **[9:78]    Two different types of attack:**    There are, in effect, two different types of Rule 12(b)(1) motions because subject matter jurisdiction can be challenged in two different ways:

• *Facial attacks*—motions attacking subject matter jurisdiction solely on the basis of the allegations in the complaint (together with documents attached to the complaint, judicially noticed facts and any undisputed facts evidenced in the record) in the light most favorable to plaintiff; and

• *Factual attacks ("speaking motions")*—motions attacking subject matter jurisdiction as matter of *fact;* i.e., based on *extrinsic evidence* quite apart from the pleadings. [*Gould Electronics Inc. v. United States* (3rd Cir. 2000) 220 F3d 169, 176; *Holt v. United States* (10th Cir. 1995) 46 F3d 1000, 1002-1003; *McMorgan & Co. v. First Calif. Mortgage Co.* (ND CA 1995) 916 F.Supp. 966, 973 (citing text)]

The major difference between a facial and factual attack is that under the former, the court must consider the allegations of the complaint as true; whereas under the latter, the court determines the facts for itself. [*See Montez v. Department of Navy* (5th Cir. 2004) 392 F3d 147, 149-150; *Safe Air for Everyone v. Meyer* (9th Cir. 2004) 373 F3d 1035, 1039]

[9:79]    *Reserved.*

(1) **[9:80]    Rule 12(b)(1) motions challenging allegations of complaint ("facial attacks"):**    A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be made on the basis that the complaint fails to allege grounds for federal subject matter jurisdiction as required by Rule 8(a): I.e., lack of federal jurisdiction appears from the "face of the complaint." [*Warren v. Fox Family Worldwide, Inc.* (9th Cir. 2003) 328 F3d 1136, 1139; *Morrison v. Amway Corp.* (11th Cir. 2003) 323 F3d 920, 924, fn. 5]

(a) **Examples**

• [9:81]    P files a common law fraud claim against several defendants. P fails to allege facts establishing diversity of citizenship be-

the action. If necessary to file suit before completing your investigation (e.g., because of impending statute of limitations), move quickly to obtain discovery related to jurisdictional facts. A court may not permit such discovery after a motion challenging jurisdiction is filed if it appears that you did not proceed diligently on your own accord.

i.   [9:110]   **Costs awards:**   In any action or suit dismissed "for want of jurisdiction," the court may order "payment of just costs." [28 USC §1919; *see* ¶2:24.17]

(1)   [9:110.1]   **Not attorney fees:**   Attorney fees are not "costs" recoverable by a defendant when a complaint is dismissed for lack of subject matter jurisdiction. [*Idea Place Corp. v. Fried* (ND CA 2005) 390 F.Supp.2d 903, 905; see *Miles v. State of Calif.* (9th Cir. 2003) 320 F3d 986, 988—no "prevailing party" when dismissal is mandated by lack of subject matter jurisdiction]

3.   [9:111]   **Rule 12(b)(2)—Motion to Dismiss for Lack of Personal Jurisdiction:**   Lack of personal jurisdiction is the second ground for a Rule 12(b) motion to dismiss. [FRCP 12(b)(2)]

a.   [9:112]   **Substantive bases:**   The substantive bases for challenging personal jurisdiction (e.g., lack of "minimum contacts" between defendant and the forum state) are discussed in *Ch. 3, Personal Jurisdiction.*

b.   [9:113]   **Burden of proof on plaintiff:**   Although defendant is the moving party on the motion to dismiss, plaintiff is the party who invoked the court's jurisdiction. Therefore, plaintiff bears the burden of proof on the necessary jurisdictional facts; e.g., the existence of "minimum contacts" between defendant and the forum state. [*Rio Properties, Inc. v. Rio Int'l Interlink* (9th Cir. 2002) 284 F3d 1007, 1019; *Foster-Miller, Inc. v. Babcock & Wilcox Canada* (1st Cir. 1995) 46 F3d 138, 145; *Gardemal v. Westin Hotel Co.* (5th Cir. 1999) 186 F3d 588, 592]

c.   [9:114]   **Evidentiary considerations:**   Motions to dismiss under Rule 12(b)(2) may test either plaintiff's theory of jurisdiction or the facts supporting the theory. In evaluating plaintiff's jurisdictional theory, the court need only determine whether the facts alleged, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary. [*Credit Lyonnais Securities (USA), Inc. v. Alcantara* (2nd Cir. 1999) 183 F3d 151, 153]

On the other hand, where the motion challenges the facts alleged, a Rule 12(b)(2) motion must be decided on the basis of competent evidence (usually declarations and discovery materials). [*Data Disc, Inc. v. Systems Technology*